311 Ga. 517
FINAL COPY

S21A0276. WALLER v. THE STATE.

LAGRUA, Justice.

Appellant Derain Waller was convicted of felony murder and other crimes in connection with the shooting death of Demonde Dicks, Jr.  On appeal, Appellant contends that the evidence was legally insufficient to support his convictions generally and his conviction for armed robbery specifically, and that the trial court erred in sentencing him on the armed robbery and felony murder counts.[1]  For the reasons that follow, we affirm Appellant's

---

[1] The crimes occurred on June 15, 2016.  In February 2017, a Muscogee County grand jury indicted Appellant for malice murder, felony murder (based on armed robbery), armed robbery, possession of a firearm during the commission of a felony, possession of a firearm by a convicted felon, and violation of the Georgia Street Gang Terrorism and Prevention Act.   Prior to trial, the State moved to nolle pros the possession of a firearm by a convicted felon charge, and that charge was formally nolle prossed by the trial court on November 13, 2017.  In October 2017, Appellant was tried jointly with co-defendants Jacquawn Clark and Akeveius Powell.  The jury found Appellant guilty of felony murder, armed robbery, and possession of a firearm during the commission of a felony and not guilty of malice murder and violation of the Georgia Street Gang Terrorism and Prevention Act.  The trial court sentenced Appellant to serve life in prison without parole for the felony murder count, a

1

convictions for felony murder and possession of a firearm during the commission of a felony, but vacate his conviction for armed robbery because that conviction should have merged into the felony murder count for sentencing purposes.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Appellant was arrested on June 17, 2016, after being implicated by his cousin and co-defendant, Jacquawn Clark, in the June 15, 2016 murder of Dicks. According to Clark, on the morning of June 15, Dicks had traveled from Atlanta to Columbus aboard a Groome Transportation van. Surveillance video showed that Dicks was carrying a black backpack when he arrived in Columbus. Upon his arrival, Dicks called his friend Clark, also known as "Sosa," to arrange for Clark to

concurrent life term for the armed robbery count, and a five-year consecutive term for the firearm possession count. Appellant did not initially file a motion for new trial. However, on December 21, 2017, Appellant filed a motion for out-of-time appeal through trial counsel. On May 18, 2020, Appellant filed a motion for new trial through appellate counsel. On May 21, 2020, the trial court granted Appellant's motion for out-of-time appeal and held an evidentiary hearing on the motion for new trial. On August 17, 2020, the trial court denied Appellant's motion for new trial. Appellant filed a timely notice of appeal on August 25, 2020, and his appeal was docketed to this Court's term beginning in December 2020 and submitted for a decision on the briefs.

pick him up at the Groome Transportation Center.

At approximately 12:45 p.m., Clark picked up Dicks at Groome, driving a black Monte Carlo. Dicks told Clark he was in Columbus for a few hours "to make some moves," which Clark understood to mean to buy or sell cocaine. Clark and Dicks went to Family Dollar to purchase plastic wrap. After they entered the store, Dicks received a phone call. Dicks handed Clark some money to purchase the plastic wrap and went outside into the parking lot, still on the telephone. After Clark made the purchase and exited the store, he saw Dicks in the parking lot, leaning into the passenger side window of a white Camaro. Clark approached Dicks and handed him the plastic wrap, and Dicks then gave it to someone inside the vehicle. Dicks also put some money into his pocket.

Clark and Dicks then drove to a nearby residence where Dicks purchased marijuana. Around this time, Clark made two phone calls to a contact named "Spoonk" — a moniker Appellant used to identify himself on Facebook.

After Appellant received the phone calls from Clark, Appellant

3

exchanged several text messages with Akeveius Powell, Appellant's other co-defendant at trial. At trial, Detective Sandra Hickey testified about the content of this text exchange, which took place between 1:43 p.m. and 2:04 p.m. A summary of her testimony regarding their text exchange is as follows:

At 1:43 p.m., Appellant initiated a text conversation with Powell, telling Powell that a man with Clark had "40 bands," and "he a murder homie." Appellant then asked Powell for the "green light." Powell asked who the man was, and Appellant responded that he did not know the man, but "he wit[h] sosa" (a/k/a Clark). Powell texted in response, "Greenlight shawty." Appellant asked Powell to come and get him, but Powell responded that he did not have the "wheels yet," followed by, "Get the murder ni**a." Appellant responded that he was fixing to "do" the man and then have Clark bring Appellant to Powell's house, again stating that the man had "[a]bout 50k." Powell responded, "Okilla."

Appellant and Clark also exchanged text messages during this timeframe, and Detective Hickey testified at trial about the content

4

of this exchange, as well, which is summarized as follows: Appellant texted Clark, stating, "Let me do him." Clark responded that he would let Appellant "do" it, but Clark had to set it up first because he and Dicks were supposed to be "Rxllin." Clark then texted Appellant that they would have to kill Dicks, to which Appellant responded, "Ik."

According to Clark, Clark and Dicks arrived at the Double Churches Park between 2:30 p.m. and 3:00 p.m. and went to the basketball court in the back of the park to smoke marijuana. Witnesses testified that they also saw a third man with Clark and Dicks when they arrived at the park. Right after the men finished smoking, Dicks was shot in the back of the head, and Clark immediately left the park in the Monte Carlo. As he was leaving, Clark called Powell and drove directly to the Walden Pond Apartments, where Powell was staying. Clark then called his mother, who advised him that he needed to go to the police to tell them what happened. Clark's mother picked him up at the apartment complex, and they returned to the park to talk to the

5

police.

Harvey Carter was at the park that afternoon. While Carter was standing in the parking lot, he saw some people near the basketball court. Carter then heard what sounded like "a firecracker, maybe a car backfire, maybe gunfire," and saw two men enter the parking lot, get into a black car, and drive away. Carter noticed that the men were no longer at the basketball court and saw something on the ground that resembled a bag or a jacket. Upon realizing it was a body, he alerted a park staff member, who then called 911.

Hunter Bradberry was in the parking lot at the park that afternoon when a car with three men inside pulled up next to him. Bradberry saw the men get out and walk to the basketball court. Later, he heard what sounded like a gunshot.

At 3:01 p.m., the Columbus Police Department received a call about the shooting at the park. When police officers arrived, they found Dicks, deceased, lying on the ground near the basketball court with a fatal gunshot wound to the back of his head.

6

Between 3:30 p.m. and 4:00 p.m., Clark returned to the scene and spoke to police officers, telling them he knew the identity of the shooter. Clark agreed to go to police headquarters to be formally interviewed. In the interview, Clark told police officers that he went to the park with Dicks to smoke marijuana, and when they finished and turned to leave, Dicks was "being shot, falling to the ground." Clark stated that "he knew who committed this crime and that [the] individual was [Clark's] cousin." Clark stated that after the shooting, he ran off and drove to Walden Pond Apartments, immediately calling his mother to tell her what happened. Clark did not tell police officers about any communications he had with Appellant or Powell prior to the shooting or mention the black backpack that was in Dicks's possession when Clark picked him up at Groome.

Following the interview with Clark, police officers obtained his cell phone. Police officers then executed search warrants to obtain records connected to Clark's cell phone, and later, to the cell phones used by Appellant and Powell on June 15. After additional

investigation, police officers asked Clark to return to police headquarters for a second interview on June 17.

During this interview, police officers asked Clark if Dicks had anything in his possession when Clark picked him up on June 15, and Clark mentioned Dicks was carrying a small backpack. Clark also stated that he saw the backpack at the Walden Pond Apartments after Dicks was shot. Police officers asked Clark if he had any interest in robbing Dicks, and Clark denied any such interest. At the conclusion of this interview, Clark was arrested. Police officers then secured arrest warrants for Appellant and Powell, and Appellant was arrested later that day.

During Appellant's incarceration following his arrest, he shared a jail cell with Anthony Faust for approximately two months. During this time, Appellant told Faust that he and his cousin "robbed a dude and killed the dude for $40,000." Appellant told Faust the crime happened at Double Churches Park by the basketball court, saying "they drove back from the Groome to the park," "smoked a blunt," and then "killed the dude." Appellant

8

indicated he had fired the shot and that the $40,000 was inside the backpack the man he killed had with him. Appellant said he gave his cousin $15,000, and that Clark was supposed to go to Atlanta, but instead, Clark went and got his mother and returned to the crime scene. Appellant said Clark was the one who set everything up, and they communicated about it by cell phone. Appellant said he should have killed Clark afterward. Faust then reported what Appellant told him to the deputies at the jail who contacted the police.

2. Appellant contends that the evidence presented at trial was insufficient to support his convictions and, in particular, was insufficient to support his conviction for armed robbery. We disagree.

In evaluating the sufficiency of the evidence of a defendant's guilt, "the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt pursuant to *Jackson v. Virginia*[, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979)]." *Battle v. State*, 301 Ga. 694, 701 (5) (804

9

SE2d 46) (2017). Thus, we do not reweigh the evidence or resolve conflicts in trial testimony; instead, "we view the evidence in a light most favorable to the . . . verdicts, with deference to the jury's assessment of the weight and credibility of the evidence." Id.

(a) Addressing first the armed robbery charge, which was the predicate offense for the felony murder conviction, Appellant asserts that the State's theory at trial was that Dicks had $40,000 in his backpack at the time he was killed. Appellant argues that while there was sufficient evidence to show that Dicks had a backpack when he arrived in Columbus, the evidence was insufficient to show that Dicks had $40,000 when he was shot or that the backpack was in his immediate presence. In addition, Appellant claims there was no evidence to show where the backpack was when Dicks went to Double Churches Park, what ultimately happened to the backpack or any money inside, or that Appellant ever had the money. Appellant also argues that the only evidence of what happened when Dicks was shot came from the statement Clark made to police officers, and Clark did not tell police officers anything about the

10

money.

On this basis, Appellant contends that the State failed to prove beyond a reasonable doubt that the money and the backpack were taken from the immediate presence of Dicks or that force was used either before or after Dicks was shot. Appellant further contends that because the evidence was insufficient to prove armed robbery, the felony murder charge based on the armed robbery also fails. We see no merit to these contentions.

"A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]" OCGA § 16-8-41 (a). The burden is on the State to "prove that the defendant's use of the weapon occurred prior to or contemporaneously with the taking." *Johnson v. State*, 307 Ga. 44, 49 (2) (b) (834 SE2d 83) (2019). However, the use of the weapon may still be considered contemporaneous where the killing occurs first and the taking of the property occurs second. See *Hester v. State*, 282 Ga. 239, 240 (2) (647 SE2d 60) (2007) (holding that "[i]t is well-

11

settled that a defendant commits a robbery if he kills the victim first and then takes the victim's property") (citation and punctuation omitted). In addition, the jury can rely on circumstantial evidence to infer that the defendant used force in taking the property of the victim. See *Johnson*, 307 Ga. at 49 (2) (b).

Here, the evidence showed that when Dicks arrived in Columbus, he had a black backpack in his possession, but when his body was located at Double Churches Park, he was no longer in possession of the backpack. The evidence also showed that Appellant and Clark believed that Dicks's backpack contained about $40,000 in cash, and Appellant exchanged numerous text messages with Powell and Clark, intimating that Appellant wanted to rob Dicks. These messages further indicated that the men knew they would probably have to kill Dicks in order to take the money, demonstrating that the robbery was the motive for the murder. Witnesses at the scene also said they saw at least three men at the basketball court, and after hearing a gunshot, witnesses saw only two men returning to a black vehicle. Clark admitted to police that

he drove to Walden Pond Apartments in a black Monte Carlo after the shooting and saw Dicks's backpack at the apartments. Following Appellant's arrest, Appellant admitted to his cellmate, Faust, that he and his cousin "robbed a dude and killed the dude for $40,000." Appellant also admitted that he was the shooter. Based upon this evidence, the jury was authorized to make the reasonable inference that Appellant used force against Dicks contemporaneously with the taking of his backpack.

Additionally, the evidence in this case was sufficient to prove that at a minimum, Appellant was a participant in the armed robbery of Dicks, and "[i]t is certain that a participant in a crime may be convicted for the crime although he or she is not the one who directly committed the crime." *Battle*, 301 Ga. at 701 (5) (citing OCGA § 16-2-21). Thus, we determine that the evidence was sufficient to enable the jury to find Appellant guilty of armed robbery, as well as felony murder based upon the armed robbery, beyond a reasonable doubt, and his argument to the contrary fails. See *Francis v. State*, 266 Ga. 69, 71 (1) (463 SE2d 859) (1995) (citing

13

*Jackson*, 443 U. S. at 319 (III) (B)).

(b) Appellant also contends that the evidence was insufficient to support his convictions generally because (1) none of the witnesses at the park identified Appellant as the person who shot Dicks or as the second man they saw at the scene; (2) no physical evidence existed connecting Appellant to the crimes; and (3) there was insufficient evidence to show that Appellant was the person known as "Spoonk." We disagree.

The evidence presented at trial showed that the cell phone number utilized by Appellant on June 15 appeared in Clark's cell phone under the contact name "Spoonk." Appellant also referred to himself as "Spoonk" on social media, as well as in mail and e-mails received at the jail following his arrest. In addition, Appellant made a full confession to Faust during his pre-trial incarceration, identifying himself as the one who shot Dicks.

Based upon the above, we conclude that the evidence was sufficient for a jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Johnson*, 307 Ga.

at 48 (2) (a).  Thus, this enumeration of error fails.

3.  Appellant contends that the trial court erred in sentencing him on both the armed robbery and felony murder counts.  We agree.

Here, the jury convicted Appellant of armed robbery and felony murder predicated on the same armed robbery.  "[B]ecause armed robbery was the predicate felony to support the felony murder conviction, the trial court should have merged the armed robbery count into the felony murder count for sentencing purposes rather than sentencing [Appellant] on that count." *Jones v. State*, 305 Ga. 744, 744 n.1 (827 SE2d 887) (2019).  See also *Culpepper v. State*, 289 Ga. 736, 737 (2) (715 SE2d 155) (2011) ("When the only murder conviction is for felony murder and a defendant is convicted of both felony murder and the predicate felony of the felony murder charge, the conviction for the predicate felony merges into the felony murder conviction.").  As such, the armed robbery count merged into the felony murder count, and the armed robbery conviction must be vacated.  See *Jones*, 305 Ga. at 744.  See also OCGA § 16-1-7 (a) (1) (providing that a defendant may not be convicted of two crimes

15

where one is "included in the other"); *Norris v. State*, 302 Ga. 802, 805 (III) (809 SE2d 752) (2018) (holding that one crime is "included in the other" so that the convictions should merge for sentencing when one of the crimes is "established by proof of the same or less than all of the facts") (citation and punctuation omitted).

*Judgment affirmed in part and vacated in part. All the Justices concur.*

Decided May 17, 2021.

Murder. Muscogee Superior Court. Before Judge Rumer.

*Angela Dillon*, for appellant.

*Julia F. Slater, District Attorney, William D. Kelly, Jr., Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.