NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 31, 2023

S23A0276.  PEREZ v. THE STATE.

WARREN, Justice.

Geovanni Perez was convicted of felony murder and a firearm offense in connection with the shooting death of Rahmier Gardner.[1]

---

[1] The crimes occurred on July 29, 2018.  In December 2018, a Gwinnett County grand jury indicted Perez, Estefania Castro, and Khalid Bays, individually and as parties to the crime, for two counts of felony murder (based on armed robbery and conspiracy to commit armed robbery), armed robbery, and conspiracy to commit armed robbery.  Perez and Bays were also indicted for malice murder, felony murder (based on aggravated assault), aggravated assault, and possession of a firearm during the commission of a felony; Castro was also indicted for tampering with evidence.  Perez alone was tried from September 13 to 20, 2021; the jury found him guilty of voluntary manslaughter as a lesser offense of malice murder and of the remaining crimes.  The trial court sentenced him to serve 20 years for voluntary manslaughter, a consecutive sentence of life in prison without the possibility of parole for felony murder based on armed robbery, and five consecutive years for possession of a firearm during the commission of a felony.  The remaining counts were merged or vacated by operation of law.  The trial court later amended the final disposition form to reflect that the voluntary-manslaughter verdict was vacated by operation of law.  The record does not indicate how Castro's and Bays's cases were resolved.

Perez filed a timely motion for new trial, which he later amended through new counsel.  After a hearing, the trial court denied the motion in

In this appeal, Perez contends that the evidence was constitutionally insufficient to support his conviction for felony murder based on armed robbery, that the trial court erred by denying his motions to suppress certain evidence, and that he was improperly sentenced. Seeing no error, we affirm.

1.   Viewed in the light most favorable to the verdicts, the evidence presented at Perez's trial showed the following.  Around 11:20 p.m. on July 29, 2018, investigators responded to a 911 call reporting a shooting in the parking lot of a bowling alley on Lawrenceville Highway in Lilburn.  Law enforcement officials found Gardner, who had been shot multiple times, dead in the parking lot, with money sticking out of his shorts pockets.  The medical examiner who later performed Gardner's autopsy determined that he had been shot at least six times at "close range" and "contact range," resulting in wounds to his chest; head; chin; upper and middle back; and left

October 2022.  Perez filed a timely notice of appeal directed to the Court of Appeals, which properly transferred the appeal to this Court, where the case was docketed to the term beginning in December 2022 and submitted for a decision on the briefs.

upper arm, elbow, and forearm. The examiner removed two .380 bullets and a .45-caliber bullet from Gardner's body.

A witness to the shooting heard what she thought were "firecrackers" and then saw Gardner's body on the ground as a silver Nissan Sentra sped out of the parking lot. The lead investigator for the case obtained a surveillance video recording from the parking lot, which was played for the jury at trial. The investigator testified that the recording, the quality of which he described as poor, showed that at 11:03 p.m., Gardner, who appeared to be talking on a cell phone, left the bowling alley and walked to the parking lot, where he stood by his truck. At 11:07 p.m., a car pulled into the parking lot and backed into a parking space; Gardner then walked to the car, and a few minutes later, there was "some movement . . . at the car" before the car sped away. The recording did not contain any other information relevant to the investigation.

After Gardner's murder, the investigator searched Gardner's truck and found marijuana and cocaine. He also obtained Gardner's cell phone records, which showed that a phone number ending

in -1131 contacted Gardner's phone at 10:14, 11:02, and 11:07 p.m. on the night of the shooting.

The investigator then obtained search warrants for the cell phone records, including cell site location information ("CSLI"), connected to the -1131 phone number. The records showed that four days after the shooting, the -1131 phone number was changed to a phone number ending in -9983, and that both numbers were associated with an address on South Elizabeth Place in Atlanta. The CSLI showed that the cell phone associated with the -1131 number was in Atlanta at 10:14 p.m., in Lilburn at 11:02 p.m., near the bowling alley on Lawrenceville Highway at 11:07 p.m., and then in Atlanta again at 12:02 a.m.[2]

At some point, investigators identified Estefania Castro as a suspect in connection with the shooting; she was arrested in October 2018. During a search of her silver Nissan Sentra, investigators found blood inside the rear passenger-side door and under the

---

[2] A disc containing the cell phone records was admitted into evidence at trial.

4

passenger-side backseat; testing later showed that the blood was Gardner's. Investigators also found a .45-caliber bullet under the backseat. A firearms examiner determined that this bullet and the .45-caliber bullet that was removed from Gardner's body had been fired from the same .45-caliber pistol. He also concluded that the two .380 bullets that were removed from Gardner's body were fired from the same .380 pistol.

Investigators interviewed Castro, who implicated Perez in the shooting. The lead investigator then obtained a warrant to search the house on South Elizabeth Place. Investigators found Perez there and arrested him; they also found his cell phone, which was associated with the -1131 and -9983 phone numbers. The lead investigator then obtained a search warrant for the phone; a download of the phone's contents showed the following. At 7:08 p.m. on the day before the shooting, Perez's phone sent a text message saying "U tryna hit a lick" to Castro's phone. Around 1:30 p.m. on the day of the shooting, a phone number associated with Khalid Bays sent text messages to Perez's phone saying, "I got everything

5

set up"; "U tryna do it today wen u get off"; and "He green asf."[3]

Perez's phone responded, "im just tryna c wat Steph say." Perez's

phone and Castro's phone then exchanged messages about when

they planned to leave, and Perez's phone sent a message to Bays's

phone saying, "She said she ready." Perez's phone and Bays's phone

exchanged messages agreeing to "go" sometime after 8:00 p.m. At

8:15 p.m., Bays's phone sent a message saying, "I just want

everything to go as plan." Perez's phone replied, "u sure he gone

alone"; Bays's phone responded, "Yea I'm sure and if he not who give

a fu** we got this."

On July 31, two days after the shooting, Castro's phone sent

Perez's phone a text that said, "You know that boy car Key was still

in my car, I had to destroy it cause I heard that those have trackin."

Later that day, Castro's phone sent texts to Perez's phone saying:

"Don't speak on nothing that happened"; "To no one"; "Don't brag

about it or nothing"; "Ima change everything inside my car and fix

it"; "And report my tags stolen"; "Ima fix my car first"; and "Help me

---

[3] The lead investigator testified that "asf" meant "as fu**."

6

pay it." On August 1, Castro's phone sent Perez's phone texts saying: "Change your number Geo"; "They can contact the company and get your number"; "Asap." In addition, Perez's phone contained a five-second-long video from July 30, 2018, which showed Perez and Bays pointing handguns toward the phone's camera.[4]

Castro testified at trial as follows. On July 28, Perez sent her a text message asking if she wanted to "hit a lick." The next day, Perez and Bays called her and again asked her to "take them to rob someone." She picked them up in her silver Nissan Sentra, and they told her to drive to the bowling alley on Lawrenceville Highway. Bays used Perez's phone to call someone "to buy some marijuana, but, really, [Perez and Bays] were going to rob them." When they arrived at the bowling alley around 11:00 p.m., a man, whom Castro identified at trial as Gardner, got in the passenger-side backseat of the Sentra; Perez was in the passenger seat, and Bays was in the

---

[4] Perez's cell phone, a disc containing all of the downloaded content from the phone, printouts showing the text messages between Perez's phone and Castro's and Bays's phones, and the video were admitted into evidence. The lead investigator read the text messages aloud, and the video was played for the jury.

driver-side backseat.  Gardner had marijuana in his lap, and Perez and Bays told him to weigh it.  When Gardner asked for money, Perez pulled out a gun.  Gardner pulled out his own gun and "pistol-whipp[ed]" Perez and Bays.[5]  Perez then shot Gardner several times, got out of the car, and pulled Gardner out.[6]  Perez and Bays told Castro to "drive off," and she drove them to her apartment in Atlanta. Bays "had grabbed the marijuana[,] [a]nd then when [they] got to Atlanta, [they] split it."  They also cleaned the Sentra, because there was "a lot of blood" in it.  She later found in the Sentra a "key fob" that belonged to Gardner, which she destroyed.  She then instructed Perez to change his phone number.

Perez did not testify at trial.  His defenses were that Castro

---

[5] During an interview with investigators, Castro initially said that Gardner pulled out a gun first and "pistol-whipp[ed]" Perez, but she later admitted during the interview that Perez pulled out his gun first.  In addition, Castro testified that she was charged with felony murder and armed robbery and could potentially receive sentences to serve life in prison for those crimes, that she had not made any plea deals in exchange for her testimony, but that she "wanted . . . to make a deal."

[6] Castro testified that Bays also had a gun that night, but she was not asked whether he fired it.

was "the mastermind behind the[e] whole thing"; that he acted in self-defense; and, in the alternative, that the killing amounted only to voluntary manslaughter.

2. Perez contends first that the evidence presented at his trial was constitutionally insufficient to support his conviction for felony murder based on armed robbery.[7] We disagree.

In evaluating the sufficiency of the evidence as a matter of constitutional due process, we view all of the evidence presented at trial in the light most favorable to the verdict and ask whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crime of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Drennon v. State*, 314 Ga. 854, 861 (880 SE2d 139) (2022). We leave to the jury "'the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to

---

[7] Perez also contends that the evidence did not support his "conviction" for armed robbery. Perez was found guilty of armed robbery, but he was not convicted of or sentenced for that crime, so this contention is moot. See *Rich v. State*, 307 Ga. 757, 759 n.2 (838 SE2d 255) (2020).

9

be derived from the facts.'" *Drennon*, 314 Ga. at 861 (citation omitted).

To support Perez's conviction for felony murder, the evidence presented at trial had to show that he proximately caused Gardner's death, either directly or as a party to the crime, while in the commission of an armed robbery. See OCGA § 16-5-1 (c). See also OCGA § 16-2-20 (defining parties to a crime). "A person commits the offense of armed robbery when, with intent to commit theft, he . . . takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]" OCGA § 16-8-41 (a). To convict a defendant of armed robbery, the State must prove beyond a reasonable doubt that the defendant's use of the weapon occurred "prior to or contemporaneously with the taking." *Tyler v. State*, 311 Ga. 727, 732 (859 SE2d 73) (2021) (citation and punctuation omitted).

The indictment in this case alleged that Perez, individually and as a party, committed armed robbery by using a handgun to take

marijuana from Gardner's "immediate presence."[8]  As Perez points

out, the State was thus required to prove beyond a reasonable doubt

that his use of the handgun occurred prior to or contemporaneously

with the taking of the marijuana.  Contrary to Perez's arguments,

however, the jury was authorized to conclude that the State made

such a showing here.

Viewed in the light most favorable to the verdict, the evidence

presented at trial—which included the text messages sent from

Perez's, Castro's, and Bays's phones and also Castro's testimony—

---

[8] The indictment also alleged that Perez committed armed robbery by taking Gardner's cell phone.  Perez argues that the State failed to present any evidence that he and his co-defendants took the cell phone, but we need not decide that issue, because as discussed below, the evidence was sufficient to prove that he took the marijuana. See, e.g., *Avila v. State*, 322 Ga. App. 225, 226-227 (744 SE2d 405) (2013) (holding that evidence that the appellant took a watch and bracelet from the victim was sufficient to support his conviction for armed robbery, even though the indictment alleged that the appellant took jewelry, cash, and a camera, and explaining that "[t]he State is not required to prove theft of *all* the items the indictment alleged were taken from the victim") (emphasis in original); *Booker v. State*, 242 Ga. App. 80, 82 (528 SE2d 849) (2000) (concluding that evidence that the appellant took money from the victim was sufficient to support his armed-robbery conviction, even though the indictment alleged that he took money and cocaine, and explaining that "[a]n over-inclusive list of items alleged to have been taken in an indictment for armed robbery is not fatal to the validity of the conviction"). Cf. *Davis v. State*, 281 Ga. 871, 874 (644 SE2d 113) (2007) ("Where a single victim is robbed of multiple items in a single transaction, there is only one robbery.").

11

showed that Perez, Castro, and Bays planned to rob Gardner (on the pretext of buying marijuana); when they arrived at the bowling alley, Gardner got in Castro's Sentra, put the marijuana in his lap, and asked for money, and Perez then pulled out his gun and shot Gardner multiple times, killing him; Bays "grabbed the marijuana"; and Perez, Castro, and Bays fled to Atlanta, where they split the marijuana among them. This evidence authorized the jury to infer that Perez shared with Castro and Bays a common criminal intent to rob Gardner. See *McIntyre v. State*, 312 Ga. 531, 534 (863 SE2d 166) (2021) ("'[C]riminal intent may be inferred from presence, companionship, and conduct before, during, and after the offense.'") (citation omitted). The jury also could have reasonably concluded that Perez used his gun prior to or contemporaneously with Bays's taking of the marijuana, such that the State met its burden to prove that Bays took the marijuana during or soon after the fatal confrontation. The jury was therefore authorized to conclude that the State proved beyond a reasonable doubt that Perez was a party to the crime of armed robbery, which proximately caused Gardner's

death. Accordingly, the evidence was constitutionally sufficient to support Perez's conviction, at least as a party to the crime, for felony murder based on armed robbery. See, e.g., *Tyler*, 311 Ga. at 732 (holding that the evidence, which showed that the appellant shot the victim before the taking of property, was constitutionally sufficient to support his conviction for armed robbery and explaining that "[a] defendant may be convicted of committing a robbery if he kills the victim first and then takes property in his possession"); *Waller v. State*, 311 Ga. 517, 522-523 (858 SE2d 683) (2021) (concluding that the evidence—which showed that the appellant and his co-defendants planned to rob the victim of a backpack containing cash and that after the victim was shot, he was no longer in possession of the backpack—was constitutionally sufficient to support the appellant's conviction for felony murder based on armed robbery, and explaining that the jury was authorized to infer that the appellant used force against the victim contemporaneously with the taking of the backpack); *Lumpkin v. State*, 310 Ga. 139, 146 (849 SE2d 175) (2020) (holding that the evidence was sufficient to

13

support the appellant's armed-robbery conviction and explaining that there was no evidence that the taking of a laptop occurred before the assailants' use of force against the victim).

3. Perez also contends that the trial court erred by denying three pretrial motions he filed seeking to suppress certain evidence. We address each of the motions in turn.

(a)  Perez's first motion sought to suppress evidence derived from the execution of two search warrants on the grounds that the warrants violated the Fourth Amendment to the United States Constitution because they lacked probable cause and sufficient particularity.  See U.S. CONST. amend. IV (stating, in pertinent part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized").  The first warrant, which was issued on August 3, 2018, five days after the shooting, authorized investigators to obtain real-time geolocation information and real-time CSLI so that they could "track" the cell phone associated with the -1131 number until the investigation ended or

14

for 45 days, whichever occurred sooner. The warrant also authorized investigators to obtain phone records associated with the -1131 number for 45 days, beginning on August 3. The second search warrant, which was issued on August 20, 2018, authorized investigators to obtain phone records for the -1131 phone number from July 1 to 31, 2018, including, among other things, information regarding the date, time, and phone numbers associated with incoming and outgoing phone calls; incoming and outgoing text messages, without content; subscriber information; and historical CSLI. After a hearing, the trial court denied Perez's motion.

In this Court, Perez maintains his arguments that the search warrants lacked probable cause and sufficient particularity.[9] We

---

[9] United States Supreme Court precedent makes clear that the acquisition of Perez's cell phone records, including historical CSLI, constituted a Fourth Amendment search for which the lead investigator was required to obtain a warrant. See *Carpenter v. United States*, ___ U.S. ___ (201 LE2d 507, 138 SCt 2206, 2220-2221 & n.3) (2018) (holding that the acquisition of seven days of historical CSLI constitutes a Fourth Amendment search for which the government generally must obtain a search warrant supported by probable cause); *Riley v. California*, 573 U.S. 373, 403 (134 SCt 2473, 189 LE2d 430) (2014) (holding that in order to search the digital information on a suspect's cell phone incident to his arrest, investigators are generally required to obtain a warrant). But neither that Court, nor this one, has addressed whether the

address first Perez's claim that the warrants lacked probable cause.

> In determining whether probable cause exists to issue a search warrant, the magistrate's task "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." "The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life." "On appellate review, our duty is to determine if the magistrate had a 'substantial basis' for concluding that probable cause existed to issue the search warrant." The decision of a magistrate "to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court[,] and even doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper." "The probable cause test requires only a fair probability—less than a certainty but more than a mere suspicion of possibility—which by no means is to be equated with proof by even so much as a preponderance of the evidence."

---

collection of real-time geolocation information or real-time CSLI qualifies as a Fourth Amendment search. See *Carpenter*, 138 SCt at 2220 (noting that the Court expressed no view on real-time CSLI). And we need not decide that issue today, because the lead investigator did obtain a warrant authorizing him to track the cell phone (and to obtain certain records), and as discussed below, the warrant was supported by probable cause and was sufficiently particular. We will therefore assume, without deciding, that the portion of the warrant permitting the tracking was required in the first place. See, e.g., *United States v. Gibson*, 996 F3d 451, 460 (7th Cir. 2021) (assuming without deciding that using real-time GPS location data to track a cell phone was a Fourth Amendment search); *United States v. Sheckles*, 996 F3d 330, 338 (6th Cir. 2021) (assuming without deciding that tracking a cell phone through real-time CSLI was a Fourth Amendment search).

16

*Copeland v. State*, 314 Ga. 44, 49 (875 SE2d 636) (2022) (citations omitted).

In the affidavits supporting the two search warrants at issue here, the lead investigator attested, in pertinent part, as follows. After the shooting, investigators found marijuana and cocaine, which were packaged for sale, in Gardner's truck in the bowling alley parking lot, and two people who were at the bowling alley that night admitted that they had purchased drugs from Gardner. Gardner's cell phone records showed that he received a call from the -1131 phone number at 10:14 p.m. He received another call from that number at 11:02 p.m., and surveillance video showed that at 11:03 p.m., Gardner appeared to be on his cell phone as he left the bowling alley and walked to his truck in the parking lot. Gardner received another call from the -1131 number at 11:07 p.m. The surveillance video showed that a "sedan" pulled into the parking lot around that time and that Gardner got into the sedan. Several minutes later, the video showed Gardner fall out of the car and to the ground as the sedan sped away. The lead investigator stated

that, based on the events on the night of the shooting, there was reason to believe that the person using the -1131 number or an accomplice of that person called Gardner about a drug deal, luring him to the sedan, and that the person then shot and killed Gardner, or participated in the shooting as an accomplice in the crimes.

The facts outlined in the affidavits authorized the judge who issued the warrants[10] to infer that someone associated with the sedan used the -1131 phone number to call Gardner to communicate about purchasing drugs in the bowling alley parking lot, and that during the drug deal, the caller or one of his accomplices shot and killed Gardner. Given the totality of the circumstances set forth in the affidavits, the judge had a substantial basis for concluding that there was a fair probability that the real-time and historical location of the cell phone associated with the -1131 number and the records for that number would lead to relevant evidence with respect to the identities and whereabouts of the shooter and any accomplices, thus

---

[10] We note that a Gwinnett County superior court judge issued the two search warrants at issue here; magistrate judges issued the warrants discussed in Divisions 3 (b) and (c) below.

18

facilitating their apprehension, as well as evidence of their location and communications with each other and Gardner around the time of the crimes. Accordingly, the judge had a substantial basis for concluding that probable cause existed to issue the search warrants. See, e.g., *Copeland*, 314 Ga. at 49-51 (holding that probable cause supported a warrant to obtain the appellant's cell phone records, because the affidavit set forth facts showing that another suspect, who investigators believed was "on the run," called the appellant before and after the shootings and that her phone pinged near the crime scene and then became stationary near the appellant's address; these facts authorized the magistrate to infer that the appellant's cell phone records would contain information about his communications with the suspect near the time of the crimes); *United States v. Gibson*, 996 F3d 451, 460-462 (7th Cir. 2021) (holding that court orders that met the requirements for a search warrant and authorized investigators to use real-time GPS location data to track a cell phone used by the appellants were supported by probable cause, because the affidavits set forth facts indicating that

19

the phone was used to conduct drug deals, investigators did not know who the users of the phone were, and tracking the phone would facilitate the apprehension of the drug traffickers); *United States v. Sheckles*, 996 F3d 330, 338-339 (6th Cir. 2021) (determining that a warrant authorizing investigators to track a cell phone number (later determined to belong to the appellant) through real-time CSLI was supported by probable cause, because the affidavit underlying the warrant set forth facts showing that the phone number belonged to a drug distributor, whose identity was not yet known, and the phone's location would therefore "likely yield useful evidence of criminal activity, including the distributor's identity"); *United States v. Bass*, 785 F3d 1043, 1049 (6th Cir. 2015) (holding that the magistrate properly concluded that there was probable cause to support a warrant to search the appellant's cell phone, because the affidavit underlying the warrant "showed a fair probability that evidence of fraud—including contacts between co-conspirators—would be found within the cell phone").

We now turn to Perez's claim regarding the Fourth

20

Amendment's particularity requirement. As an initial matter, it is unclear whether Perez challenges both search warrants or only the second warrant, which authorized investigators to obtain phone records for the -1131 phone number from July 1 to 31, 2018, on this ground. He appears to assert that both warrants authorized the disclosure of his cell phone's real-time tracking information and his cell phone records for an overly broad period of time, and were therefore insufficiently particular, but he also seems to make arguments pertaining only to the second warrant's date range of July 1 to 31, 2018. We will assume, however, that Perez's claim here relates to both warrants, and that he properly preserved this claim for ordinary appellate review, because it fails in any event.

> The Fourth Amendment to the United States Constitution "require[s] that a search warrant particularly describe the article or articles sought." In addition to requiring that officers have enough guidance to locate and seize only those items the warrant authorizes them to seize, th[e] particularity requirement also prevents general searches—that "general, exploratory rummaging in a person's belongings" by the government that has been rejected since the founding as a violation of "fundamental rights." The particularity requirement is "applied with a practical margin of

21

flexibility, depending on the type of property to be seized, and a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit."

*State v. Wilson*, 315 Ga. 613, 614-615 (884 SE2d 298) (2023) (citations omitted).

Perez cites no authority to support his argument that the date ranges in the two warrants were overbroad, and as explained below, we conclude that they were sufficiently particular under the circumstances. The lead investigator obtained the first search warrant on August 3, 2018, five days after the shooting; he obtained the second warrant on August 20, 2018, about three weeks after the shooting. As discussed above in relation to Perez's probable-cause claim, at the time the warrants were issued, the facts of the investigation, as set forth in the underlying affidavits, indicated that on July 29, 2018, the shooter or "an accomplice to the shooter" used the -1131 phone number to call Gardner to communicate about purchasing drugs in the bowling alley parking lot; arrived at the parking lot in a sedan; met with Gardner; and then shot and killed

22

him. At that time, investigators had not yet located the sedan, identified or apprehended any of the assailants, determined their relationship to or prior contact with Gardner, or uncovered their motive for killing him. Nor did investigators know the exact time period during which the unidentified assailants communicated with each other or Gardner.

Given these circumstances, the date ranges set forth in the two search warrants—from August 3 to September 17 (45 days, or with respect to the tracking information, sooner if the investigation ended before September 17) in the first warrant and July 1 to 31 (30 days) in the second warrant—were sufficiently limited, thus preventing an impermissible general search of data. See id. at 614. Because, using a practical margin of flexibility, the date ranges in the search warrants were as specific as the circumstances and nature of the activity under investigation permitted, the warrants were not overbroad and insufficiently particular in this respect. See id. at 615. For these reasons, the trial court did not err by denying Perez's motion to suppress evidence obtained from the two search warrants

23

discussed above.

(b) Perez also challenges the trial court's denial of his second motion, which sought to suppress evidence garnered from the execution of a warrant to search his house on South Elizabeth Place. The warrant, which was issued on September 24, 2018, about two months after the shooting, authorized investigators to search for and seize "[a]ll firearms, all ammunition, all cellular telephones, keys/key fob to the victim's Nissan Titan, [and] clothing containing blood sp[]atter." During the search, investigators seized, among other things, Perez's driver's license and his cell phone, which, as discussed above, was associated with the -1131 and -9983 phone numbers and yielded incriminating evidence. Perez argues that the search warrant was not based on probable cause. He also seems to assert that the warrant was overbroad because it authorized investigators to search for car keys and a driver's license. These claims are meritless.

As to probable cause, the affidavit in support of the search warrant set forth facts that were substantially similar to the facts

24

presented in the affidavits underlying the two search warrants discussed in Division 3 (a) above, and added the following. The phone records for the -1131 phone number showed that the number was associated with an address on South Elizabeth Place, and the lead investigator learned that the -1131 number was changed on August 2, 2018, four days after the shooting; he also learned through the Georgia Crime Information Center that the -1131 number was used by Perez, who lived at the address on South Elizabeth Place. The investigator interviewed a friend of Bays, who said that Bays had admitted that he and another man shot someone during a marijuana deal in Lilburn. The investigator then interviewed Bays, who had turned himself in to investigators; Bays admitted that he and Perez shot Gardner in the car in the parking lot of the bowling alley. The lead investigator also attested that based on his experience and training, the close-range shooting in the car likely would have resulted in the transfer of Gardner's blood to Perez's clothing.

These facts in the affidavit showed that Perez (or an

25

accomplice) used his cell phone to contact Gardner shortly before Perez shot and killed Gardner. The affidavit also connected Perez and the cell phone to the house on South Elizabeth Place. Given all of these circumstances, the magistrate was authorized to conclude that there was a fair probability that evidence related to the shooting would be found at the house. See *Copeland,* 314 Ga. at 49.

Perez argues that the warrant lacked probable cause because the affidavit failed to provide the magistrate with a substantial basis for crediting the statements made by Bays and Bays's friend. But the magistrate was authorized to conclude that the facts set forth in the affidavit that were obtained during the interview of the friend were corroborated by Bays, who had turned himself in to law enforcement officials and implicated himself (and Perez) in the shooting. And the magistrate could have reasonably determined that other information in the affidavit—including information obtained from the crime scene, the surveillance video, and Gardner's phone records—corroborated Bays's account. See, e.g., *Willis v. State,* 315 Ga. 19, 30 (880 SE2d 158) (2022) (holding that trial

26

counsel's failure to file a motion to suppress on the ground that a search warrant was not supported by probable cause did not constitute deficient performance, because the affidavit showed that the appellant's co-defendant gave a statement to police admitting that he and the appellant were involved in shooting the victim; the statement was "against [the co-defendant's] penal interest and based on his personal knowledge"; and that was enough in itself to provide the magistrate with a substantial basis for concluding that probable cause existed); *Graddy v. State*, 277 Ga. 765, 766 (596 SE2d 109) (2004) (explaining that "[w]hen a named informant makes a declaration against penal interest and based on personal observation, that in itself provides a substantial basis for the magistrate to credit that statement") (citation, punctuation, and emphasis omitted). See also *Illinois v. Gates*, 462 U.S. 213, 244-245 (103 SCt 2317, 76 LE2d 527) (1983) ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'")

27

(citation omitted).

In sum, given the totality of the circumstances, the magistrate had a substantial basis for determining that probable cause supported the search warrant. See, e.g., *Moon v. State*, 312 Ga. 31, 57-59 (860 SE2d 519) (2021) (concluding that probable cause supported the issuance of a warrant authorizing a search of the appellant's house because the underlying affidavit said that a surveillance video showed the car used in the shooting, the owner of the car told investigators that she loaned it to the appellant, and phone records showed that his cell phone was near the crime scene around the time of the shooting, and rejecting the appellant's argument that the owner of the car was unreliable); *Glenn v. State*, 302 Ga. 276, 281-282 (806 SE2d 564) (2017) (holding that the magistrate was authorized to conclude that probable cause existed for the issuance of a warrant to search the appellant's residence, because the affidavit supporting the warrant recounted that the appellant was identified through surveillance video of the crimes and another person who was involved in the crimes had identified

the appellant as the shooter).[11]

Perez also briefly argues that the search warrant was overbroad because it was not probable that two of the items listed in the warrant—a driver's license and the keys to Gardner's Nissan Titan—were connected to the crimes or that they would be found in the house on South Elizabeth Place. Contrary to Perez's assertion, the warrant did not authorize investigators to search for a driver's license, so his contention on this point fails.[12] And with respect to

---

[11] In support of his probable-cause claim, Perez relies on *United States v. Griffith*, which held that a warrant authorizing a search of the appellant's apartment for cell phones, among other things, was not supported by probable cause, because the affidavit underlying the warrant failed to set forth any facts showing that the appellant owned a cell phone, that any cell phones would be found in the apartment, or that they would contain evidence related to the crimes, which occurred more than a year before the search. See 867 F3d 1265, 1268-1275 (D.C. Cir. 2017). But the circumstances in this case are dissimilar to those in *Griffith*. Here, the affidavit set forth facts indicating that Perez owned the cell phone associated with the number that contacted Gardner shortly before Perez shot him; that Perez and his phone were linked to the house on South Elizabeth Place; and that the phone would contain evidence related to the crimes, which were committed only two months before the search.

[12] Perez does not contend that the investigators' seizure of his driver's license exceeded the scope of the search warrant, so we do not address that issue. See, e.g., *George v. State*, 312 Ga. 801, 804-805 (865 SE2d 127) (2021) (discussing the appellant's claim that investigators seized evidence that was beyond the scope of the search warrant and explaining that the plain-view exception to the warrant requirement may apply in such circumstances).

the car keys, the affidavit underlying the warrant attested that investigators did not locate "the keys and key fob to [Gardner's] Nissan Titan truck[,] which he drove to the bowling alley." The magistrate could reasonably infer from this information that Perez took Gardner's keys and key fob at the time of the shooting and that there was a fair probability that those items would be found at Perez's house. See, e.g., id. at 282 (holding that the magistrate properly concluded that it was fairly probable that the items listed in the search warrant, which included personal effects of the victim that were not recovered at the crime scene, would be found at the apartment where the appellant, a suspect in the crime, was residing, because the fact that the appellant lived at the apartment "meant that there was at least a 'fair probability' that items related to the crime would be found there"). Accordingly, the trial court did not err by denying Perez's motion to suppress evidence obtained from the search of his house.

(c) Perez also contends that the trial court erred by denying his third motion, which sought to suppress evidence derived from a

30

warrant that permitted investigators to search his cell phone. The warrant, which was issued on September 25, 2018, the day after Perez's house was searched, authorized the search and seizure of "call logs, text messages, photos, videos, social media content (Snapchat, Instagram, Facebook etc.) and any other application or data that could have been used to communicate with the victim or other suspects." After the warrant was issued, investigators downloaded from Perez's cell phone the data authorized by the warrant, which produced incriminating evidence that was admitted at trial. Perez argues that the trial court should have suppressed this evidence, because the warrant was not supported by probable cause and was overbroad, in violation of the particularity requirement.

With respect to probable cause, the facts set forth in the affidavit supporting the warrant were substantially similar to the facts presented in the affidavits described in Divisions 3 (a) and (b) above, except there was no mention of the information obtained from Bays and Bays's friend. The affidavit also added that the -1131

31

phone number was changed to the -9983 number on August 2, 2018; the CSLI for the phone showed that it was near the bowling alley at the time of the shooting; Perez was arrested on September 24; and investigators seized his cell phone, which investigators confirmed was associated with the -1131 and -9983 phone numbers.

Based on the facts in the affidavit, the magistrate could have reasonably concluded that Perez or one of his accomplices used Perez's cell phone to call Gardner about purchasing drugs in the bowling alley parking lot; that Perez (and his accomplices) were in the sedan that Gardner entered just before he was shot; and that Perez (or an accomplice) was the shooter. Given the totality of the circumstances presented in the affidavit, the magistrate had a substantial basis for concluding that there was a fair probability that the cell phone would contain evidence of the crimes. Thus, the magistrate had a substantial basis for determining that probable cause existed to issue the search warrant. See *Copeland*, 314 Ga. at 49-51. See also *Glispie v. State*, 300 Ga. 128, 133 (793 SE2d 381) (2016) (holding that the magistrate had a substantial basis for

32

concluding that probable cause existed to issue a search warrant for the appellant's cell phone because the affidavit underlying the warrant said that police had found drugs, cash, and two cell phones in the appellant's possession as part of a lawful search incident to arrest, which authorized the magistrate to infer that the cell phones were used as communicative devices with third parties for drug deals).

Perez also contends that the warrant was overbroad because it authorized the search and seizure of text messages, social media, photos, and videos, without showing how this data was connected to the crimes and without any temporal limitation. As explained below, we conclude that the warrant was sufficiently particular.

To begin, the warrant did not simply provide an unbounded description authorizing the search and seizure of any and all data on the cell phone, without linking that data to the crimes at issue. Rather, the language of the warrant, in context, makes clear that it authorized the search and seizure of only those classes of applications and data that could have been used to communicate

with the victim or other suspects.

Specifically, after stating that there was probable cause to believe that the crimes of felony murder and aggravated assault had been committed, the warrant listed certain classes of applications and data to be searched for and seized: "call logs, text messages, photos, videos, [and] social media content (Snapchat, Instagram, Facebook etc.)." This series of items was followed by the phrase "and any other application or data that could have been used to communicate with the victim or other suspects." The language "and any other application or data," read in proper context with the rest of the sentence, which contains a lengthy list of particular types of applications and data, indicates that the phrase "and any other application or data that could have been used to communicate with the victim or other suspects" modifies the entire list of items preceding it. In other words, the warrant authorized the search of call logs that could have shown communications with the victim or other suspects, text messages that could have shown communications with the victim or other suspects, and so on. See

34

*Scott v. State*, 299 Ga. 568, 572-573 (788 SE2d 468) (2016) (explaining, in the context of construing the meaning of a statute, that "a qualifying phrase appearing at the end of a series should be read to apply to all items in the series 'when such an application would represent a natural construction'") (citation omitted); Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary (defining "and" in this context as "a function word to indicate connection or addition especially of items within the same class or type—used to join sentence elements of the same grammatical rank or function"; and defining "any other" in this context as "in addition to the . . . thing just mentioned"). See also ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012) (explaining that "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a . . . postpositive modifier normally applies to the entire series").

Thus, reading the warrant as a whole, the phrase "and any other application or data that could have been used to communicate

35

with the victim or other suspects" is most reasonably understood to limit all of the listed classes of applications and data to applications and data that could have been used to communicate with the victim or other suspects.  See *Blach v. Diaz-Verson*, 303 Ga. 63, 64-66 (810 SE2d 129) (2018) (construing the phrase "'or other organization held out to the public as a place of deposit of funds or medium of savings or collective investment'" at the end of a list of kinds of banks, credit unions, associations, companies, and funds in a statute defining "financial institution" as "describ[ing] generally all the entities" in the preceding list and explaining that the word "or" may be used as a reiterative term); *Alpine Glass, Inc. v. Illinois Farmers Insurance Co.*, 643 F3d 659, 665 (8th Cir. 2011) (concluding that the phrase "'or any other tangible thing or item of monetary value,'" which followed a list of prohibited items in a statute, meant that those items constituted "'tangible thing[s] or item[s] of monetary value'").[13]

---

[13] Several of us recently have expressed concerns about whether catchall phrases (or "residual clauses") in a search warrant—like the phrase "'any other evidence of the crime of murder'" after a list of items to be searched for and seized—can limit the list of items preceding it and thus transform an

And contrary to Perez's argument, the breadth of the search was supported by the facts set forth in the affidavit, which indicated that Perez (and, potentially, any accomplices) used his cell phone to communicate with Gardner about arranging a drug deal in the bowling alley parking lot, where Perez or an accomplice shot and killed him. Perez argues that the affidavit stated only that he or an accomplice used the cell phone to *call* Gardner, with no mention of contacting him through text messages, photos, videos, or social

otherwise general warrant into a sufficiently particular one. *Wilson*, 315 Ga. at 617-620 (Peterson, P.J., concurring, joined by Boggs, C.J., and Warren, Bethel, Colvin, and Pinson, JJ.) (suggesting that a catch-all phrase in the description of things to be seized does not necessarily invalidate an otherwise particular warrant, but that this Court's precedent suggesting the inverse— that a warrant lacking in particularity can be saved by a catch-all phrase— may be incorrect) (citation omitted). But the phrase "and any other application or data that could have been used to communicate with the victim or other suspects" at the end of the list of applications and data described here does not implicate such concerns. As discussed in our analysis above, read in context and in its most natural and reasonable way, that phrase modifies the rest of the list and confines the types of listed applications and data to a specific category: applications and data that could have been used to communicate with the victim or other suspects. Thus, in contrast to a catch-all phrase like "any other evidence of the crime of murder"—which expands a list of certain items to be searched for and seized to encompass *any other sort* of evidence of the crimes at issue—the phrase here restricts the applications and data to be searched for and seized to applications and data that could have been used to communicate with the victim or other suspects. See id. at 620 (explaining that "the words of [a] warrant matter").

37

media. But given all of the facts set forth in the affidavit, the magistrate was authorized to make a practical, common-sense determination that Perez, and any other assailants, could have communicated with Gardner and with each other not only through phone calls, but also through text messages, photos, videos, or social media content, and that there was a fair probability that evidence related to the crimes would be found within that sort of data on Perez's cell phone. See *United States v. Reichling*, 781 F3d 883, 887 (7th Cir. 2015) (explaining, in the context of analyzing whether a magistrate properly concluded that probable cause supported a warrant to search his residence for digital and non-digital storage devices, that "'a judge is given license to draw reasonable inferences concerning where the evidence referred to in the affidavit is likely to be kept, taking into account the nature of the evidence and the offense,'" and that the probable-cause inquiry must be grounded in both an understanding of criminal behavior and of modern technology) (citation omitted). See also *Bass*, 785 F3d at 1049-1050 (holding that a warrant authorizing a search of the appellant's cell

phone for "any records of communication, indicia of use, ownership, or possession, including electronic calendars, address books, e-mails, and chat logs" was sufficiently particular, because the warrant sought evidence of fraudulent conduct related to the charges of wire fraud, credit fraud, and identity theft; the affidavit set forth a substantial basis to believe such evidence existed on the cell phone; and officers could not have known where such evidence was located on the phone or in what format).

Perez also complains that the warrant failed to expressly confine the data to be searched for and seized to a specific date range. But he cites no authority in support of that argument. And the facts set forth in the affidavit indicated that at the time the warrant was issued, investigators were still determining whether additional suspects, whose identities and whereabouts were unknown, were involved in the shooting. Under these circumstances, we cannot say that the warrant was impermissibly general on the basis that it did not set forth a specific time frame. For these reasons, Perez's claim that the search warrant was

overbroad, and thus insufficiently particular, fails. Compare

*Wilson*, 315 Ga. at 613-616 (holding that a warrant that authorized

investigators to search for and seize from the appellant's cell phone

"any and all stored electronic information, including but not limited

to; user account information, stored phone information, images, text

messages, videos, documents, e-mails, internet activity, call logs,

contact information, phone information, or any deleted data" was

not sufficiently particular, because the warrant failed to limit the

search and seizure to evidence connected to the crimes at issue).

Consequently, the trial court did not err by denying Perez's

motion to suppress evidence garnered from the search of his cell

phone. Thus, Perez's claims regarding each of the warrants he

challenges fail.

4. As discussed in footnote 1 above, Perez was found guilty of,

among other crimes, voluntary manslaughter as a lesser offense of

malice murder and felony murder based on armed robbery. The trial

court ultimately vacated the voluntary-manslaughter guilty verdict

and sentenced Perez for the felony-murder count. Perez contends

40

that under the modified merger rule set forth in *Edge v. State*, 261 Ga. 865 (414 SE2d 463) (1992), the trial court should have sentenced him for voluntary manslaughter rather than felony murder based on armed robbery.[14]  We disagree.

In rejecting a similar claim in *Smith v. State*, 272 Ga. 874 (536 SE2d 514) (2000), we explained that

> [i]n *Edge*, this court adopted a modified merger rule, holding that, when a single aggravated assault is the basis for felony murder and voluntary manslaughter charges, the defendant cannot be convicted and sentenced for felony murder if the jury also finds that the assault is mitigated by provocation and passion and convicts the defendant of voluntary manslaughter.  We adopted such a rule because "[t]o hold otherwise would eliminate voluntary manslaughter as a separate form of homicide since, in that event, every voluntary manslaughter would also be a felony murder." In *Edge*, we noted that the problem we were addressing "does not exist if the underlying felony is independent of the killing itself, such as burglary, robbery, or even an assault that is directed against someone other than the homicide victim."

Id. at 879 (footnotes containing citations omitted).  Consequently,

---

[14] Perez also contends that he should have been sentenced for voluntary manslaughter rather than felony murder based on aggravated assault. Although the jury found Perez guilty of felony murder based on aggravated assault, he was not convicted of or sentenced for that crime, so his claim regarding it is moot.  See *Williams v. State*, 313 Ga. 325, 332 (869 SE2d 389) (2022).

we have held that "the modified merger rule does not apply when the underlying felony, such as armed robbery, is independent of the killing itself." Id. at 879-880. See also *Grimes v. State*, 293 Ga. 559, 561 (748 SE2d 441) (2013) (reiterating this principle and explaining that "we generally do not apply the *Edge* modified merger rule 'to any felony murder conviction in which the underlying felony was not the aggravated assault of the murder victim'") (citation omitted).

Here, like in *Smith*, Perez's felony-murder conviction was based on an armed robbery that was "independent of the killing itself." 272 Ga. at 880. Although Perez's act of using a handgun to take marijuana from Gardner proximately caused his death, and thus supported his conviction for felony murder, the evidence presented suggested that the act was not integral to the killing. Thus, *Edge*'s modified merger rule does not apply, and Perez was properly convicted of and sentenced for felony murder. See id.; *Grimes*, 293 Ga. at 561-562 (rejecting the appellant's claim that he should have been sentenced for voluntary manslaughter instead of felony murder based on attempted armed robbery under the rule in

*Edge*, because the attempted armed robbery was independent of the killing itself).  Compare *Sanders v. State*, 281 Ga. 36, 37-38 (635 SE2d 772) (2006) (holding that the rule in *Edge* applied where the same act of setting the victim on fire resulted in the commission of all three of the felonies underlying three counts of felony murder—aggravated assault, aggravated battery, and arson in the first degree—and caused the death of the victim, so the felonies were "integral to the killing").

And to the extent Perez asserts that the jury's guilty verdicts of voluntary manslaughter and felony murder based on armed robbery were mutually exclusive, we reject that argument, just as we rejected a similar argument in *Smith*.  See 272 Ga. at 880 (holding that "[b]ecause the intent relevant to the conviction for felony murder was the underlying intent for armed robbery and because intent to kill, as well as mitigating factors such as provocation and passion, are irrelevant to that intent, the jury's verdict of felony murder does not constitute a finding that [the appellant] did not act with provocation and passion in assaulting the

victim and does not conflict with the jury's verdict of voluntary manslaughter").

*Judgment affirmed.  All the Justices concur.*