NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 5, 2024

S23A0900.  THE STATE v. LEDBETTER.
S23X0901.  LEDBETTER v. THE STATE.

WARREN, Justice.

In October 2018, John Ledbetter was indicted for murder and other crimes associated with the January 2016 shooting death of Jeremy Miller and the unrelated February 2015 shooting death of Damian Stinchcomb.  Before trial, Ledbetter filed two motions to suppress evidence.  One motion sought to suppress evidence related to Miller's shooting provided to Detective Kevin Leonpacher by Ledbetter's previous attorney, Dennis Scheib, on the ground that the information was protected by attorney-client privilege.  The other motion sought to suppress cell phone records related to Miller's shooting and cell phone records related Stinchcomb's shooting on the ground that the two warrants authorizing the search of his cell phone records were defective in several respects, including not being

supported by probable cause. The trial court granted the first motion to suppress, and the State appeals. See OCGA § 5-7-1 (a) (5) (permitting the State to appeal from a pretrial order excluding evidence under certain conditions). The trial court denied the second motion to suppress, and Ledbetter cross-appeals. See OCGA § 5-7-1 (b) ("In any instances in which any appeal is taken by and on behalf of the State of Georgia in a criminal case, the defendant shall have the right to cross appeal."). For the reasons explained below, we affirm both orders. Because each appeal has its own relevant facts and legal issues, we discuss them separately, addressing the State's pretrial appeal first.

1. *The State's Appeal, Case No. S23A0900*

(a) Miller was shot during a drug transaction on January 19, 2016, and later died in the hospital.[1] During the investigation into the shooting, Scheib, Ledbetter's attorney at the time, contacted law enforcement, and on February 5, 2016, he met with Detective

---

[1] Stinchcomb's murder is not at issue in the State's appeal and will be discussed below in Division 2, which pertains to Ledbetter's cross-appeal.

Leonpacher about the investigation and gave the detective information about the shooting, as well as physical evidence related to the shooting. Ledbetter was later arrested for Miller's murder.

After Ledbetter changed attorneys, his new trial counsel moved to suppress "all evidence provided to law enforcement" by Scheib based on attorney-client privilege.[2] At a hearing on this motion, the following evidence about Scheib's meeting with Detective Leonpacher was presented.

Detective Leonpacher testified that Scheib contacted him shortly after Miller's shooting, "essentially gauging what the police knew about the incident." Scheib was "very clear about having some limited information from his client and he proffered some generalized details of the incident . . . in somewhat hypothetical terms." In a second call later that day, Scheib stated that Ledbetter was his client. The detective then met with Scheib at Scheib's office.

---

[2] Ledbetter also argued to the trial court that the evidence should be suppressed based on Scheib's providing ineffective assistance of counsel, but that is not the ground on which the trial court relied in granting Ledbetter's motion to suppress, and Ledbetter does not pursue that argument on appeal.

The meeting at Scheib's office was audio-recorded by the detective, and the recording was played at the hearing. Scheib first gave the detective information about the vehicle involved in the shooting. He explained that it was a rental car and gave the detective the name and number of the person at the rental car company to contact about the car. Scheib then provided the following account of the shooting.[3] Ledbetter knew Miller "from before," and he and Miller arranged to meet each other in the parking lot to "talk about" a marijuana transaction. In the parking lot, Miller got into the passenger's side of Ledbetter's car and then pulled out a "chrome and black automatic pistol." Ledbetter put his hands up in the air and then reached out and grabbed the gun. They struggled. As Ledbetter pushed the gun away, it went off. Miller told Ledbetter that he had another gun. Ledbetter threw himself over Miller, and as soon as Ledbetter had control over the gun, he "fired twice."

---

[3] During this account, Scheib repeatedly prefaced statements about the shooting with "he said" or "he told me," indicating that Ledbetter had given him this information.

4

Scheib also gave the detective physical evidence, including a backpack that Ledbetter said Miller was carrying when he entered the vehicle, the clothes Ledbetter was wearing on the night of the shooting, and two guns, at least one of which Scheib indicated Ledbetter had taken from Miller.[4] At the end of the meeting, Scheib told Detective Leonpacher that Ledbetter had said that if the detective secured an arrest warrant for Ledbetter, Ledbetter would turn himself in within 24 hours because he did not want the "fugitive squad" looking for him. Scheib further explained that Ledbetter had said, "I'm not gonna run," and "I gotta deal with this." Scheib never stated that Ledbetter had waived attorney-client privilege or given Scheib permission to share any of this information.

Detective Leonpacher testified that when talking to Scheib, he was under the impression that Scheib was acting as an agent for

---

[4] When describing the incident to the detective, Scheib said Ledbetter described the gun Miller had as a "chrome and black automatic pistol," and then said, "I'll show you the gun that my client gave me." After Scheib gave the detective the gun, he said, "He's given you the weapon, and he's described it as a silver and black weapon." Scheib also gave the detective socks, a cap, a necklace, a receipt, and a shell casing.

5

Ledbetter, noting that Scheib used Ledbetter's and Miller's names in his description of the incident, rather than using hypothetical names. The detective also recalled that as Scheib was providing details, Scheib referred to his notes, leading the detective to "presume[] . . . that [Scheib] had spoken with his client and made some notes and was trying to reproduce to me the information provided by his client to him." Scheib did not provide and the detective never saw "anything that said that there was some sort of waiver of attorney-client privilege" allowing Scheib to provide this proffer.

Scheib testified that he was trying to use "hypotheticals" to "guide [Detective Leonpacher] toward looking into Mr. Miller as a robber" who had a weapon. Scheib explained, "I was using hypotheticals because I knew I couldn't say my client has actually said this without my client giving up the attorney-client privilege."[5] Scheib testified that Ledbetter had not waived attorney-client

_____

[5] The recording of the interview does not reflect that Scheib spoke in hypotheticals.

privilege or given him permission to share what Ledbetter told Scheib with "the police, the prosecution, or anybody else"; Scheib also did not have authority from Ledbetter to say that any of the items he gave the detective came from Ledbetter. Scheib further testified that Ledbetter wrote him a letter with specific information about what he wanted to do "as far as turning himself in."[6]

Ledbetter testified that he never gave Scheib permission to reveal private communications or share physical evidence. When he learned in 2018 that Scheib had given information to Detective Leonpacher, he "contact[ed] the fee arbitration people" because he "felt like [Scheib] needed to be disbarred and I needed my money

---

[6] During cross-examination, the prosecutor asked Scheib if he remembered telling the prosecutor that Ledbetter had "signed a document that was in [Scheib's] file that allowed [Scheib] to say certain things to Detective Leonpacher about the case." Scheib did not state whether he recalled making that statement, but testified that he "may have misspoken" and clarified that Ledbetter wrote him "several letters as to what to do and what not to do," but Scheib did not have any letters allowing him "to go in and give certain things."

returned."[7]  And Ledbetter hired a different attorney to represent him going forward.

(b)  On December 6, 2021, the trial court granted Ledbetter's motion to suppress evidence provided by Scheib, finding, based on the evidence presented at the hearing that:

> Scheib obtained privileged information from Defendant Ledbetter during the course of legal representation.  This information included statements as well as physical evidence.  Attorney Scheib, unilaterally and without knowledge or permission of Defendant Ledbetter, and in violation of the attorney-client privilege, violated this statutory privilege and unlawfully shared this privileged information/evidence with law enforcement.  This was error.

Citing OCGA § 24-5-501 (a) (2) and several cases, the trial court therefore ruled that "[i]n order to cure this error, the prosecution as well as all of its witnesses are hereby notified that they are not to use, directly or indirectly, any privileged evidence obtained from Attorney Scheib which includes, but is not limited to, Defendant's statements as well as physical evidence provided by Attorney Scheib

---

[7] It is not clear from the record whether Ledbetter was referencing the fee arbitration program at the State Bar, the General Counsel's office at the State Bar, or some other person or entity.

to Homicide Detective Leonpacher." The order further held that "it cannot be mentioned that Attorney Scheib ever met with the police . . . and Attorney Scheib cannot be called as a witness at trial by the State."

The State appeals the trial court's grant of Ledbetter's motion to suppress, arguing that Ledbetter has not shown a violation of attorney-client privilege through any of Scheib's communications. The State further argues that, even if there was a violation of Ledbetter's attorney-client privilege, the physical evidence provided by Scheib to Detective Leonpacher should not be suppressed, and the State should be permitted to present evidence of the source of the physical evidence, i.e., that it came from Scheib, Ledbetter's attorney. Finally, the State argues that the trial court erred by suppressing "derivative evidence"—that is, evidence derived from Scheib's statements to Detective Leonpacher.

For the reasons discussed below, we agree with the trial court that Ledbetter has shown that his attorney-client privilege was violated through Scheib's disclosures to Detective Leonpacher. And

9

because Ledbetter concedes that physical evidence is not suppressed by the trial court order at issue in this appeal, we need not decide whether the trial court could have suppressed the physical evidence Ledbetter gave to Scheib based on attorney-client privilege. However, we conclude that the trial court's order properly prohibits the State from presenting evidence to the jury that Scheib, Ledbetter's attorney, was the source of the physical evidence given to law enforcement. Finally, we conclude that the trial court order does not suppress "derivative evidence" as protected by attorney-client privilege. We therefore affirm the trial court's order granting Ledbetter's motion to suppress the evidence provided by Scheib.[8]

---

[8] The State and Ledbetter both mention certain videos of interviews with potential witnesses that Scheib allegedly gave to Detective Leonpacher. Evidence in the record indicates that Scheib provided these videos to the detective at some point after his recorded meeting with the detective. These videos were briefly mentioned by Detective Leonpacher at the motion to suppress hearing, but no clear evidence was presented about their contents or when and how they were given to the detective. Ledbetter now argues that these recordings must be suppressed as protected attorney work product. We do not address that argument, however, because it appears that it was not raised by Ledbetter in the trial court, and it was not ruled on in the suppression order at issue in this appeal.

(c) "The attorney-client privilege is 'the oldest of the privileges for confidential communications known to the common law,'" and "has long been recognized in Georgia." *St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C.*, 293 Ga. 419, 421 (746 SE2d 98) (2013) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (101 SCt 677, 66 LEd2d 584) (1981)). To that end, OCGA § 24-5-501 (a) (2) prevents evidence protected by the attorney-client privilege from being introduced as evidence: "There are certain admissions and communications excluded from evidence on grounds of public policy, including, but not limited to, the following: . . . Communications between attorney and client." See also *St. Simons Waterfront,* 293 Ga. at 421 (explaining that the "attorney-client privilege" is "currently codified" in OCGA § 24-5-501 (a) (2)).[9]

---

[9] As noted in *St. Simons Waterfront*, "[p]rior to the adoption of the 2013 Georgia Evidence Code, there were four different statutes in our evidence code addressing the attorney-client privilege." Id. at 421 n.1. The current Evidence Code "greatly simplified the statutory language constituting the privilege and eliminated certain awkward language in the prior statutes," but "the rules governing the privilege in Georgia generally remain the same." Id. (citation and punctuation omitted). Neither party has argued that any aspect of attorney-client privilege at issue in this case changed with the introduction of the current Evidence Code, and we conclude that at least as to the issues raised

"The [attorney-client] privilege generally attaches when legal advice is sought from an attorney, and operates to protect from compelled disclosure any communications, made in confidence, relating to the matter on which the client seeks advice." *St. Simons Waterfront,* 293 Ga. at 421-422. See also *Rogers v. State*, 290 Ga. 18, 20 (717 SE2d 629) (2011) ("[T]he attorney-client privilege protects communications between the client and the attorney that are intended to be confidential[.]") (citation and punctuation omitted). Ledbetter, as "the proponent of the privilege," has the burden "to establish that the privilege exists." *St. Simons Waterfront,* 293 Ga. at 429. "[T]he privilege belongs to the client, not the attorney," *Moclaire v. State*, 215 Ga. App. 360, 363 (451 SE2d 68) (1994) (citation and punctuation omitted), and the client can waive the

here, Georgia cases decided before the enactment of our current evidence code remain applicable law. Compare *Volkova v. State*, 311 Ga. 187, 194 (855 SE2d 616) (2021) (treating the rule about when attorney-client privilege is waived as to communications with "an expert engaged by the attorney" as a "judicially created exclusionary rule[] based on an interpretation of Georgia's old Evidence Code" that has been "statutorily abrogated by the enactment of our current Evidence Code").

privilege explicitly or implicitly, see *Hill, Kertscher & Wharton, LLP v. Moody*, 308 Ga. 74, 79 (839 SE2d 535) (2020).

(i) *Attorney-Client Communications*

In granting Ledbetter's motion to suppress evidence that was shared in violation of Ledbetter's attorney-client privilege, the trial court found that Scheib "obtained privileged information from Defendant Ledbetter during the course of legal representation," and that Scheib shared this information "unilaterally and without knowledge or permission of Defendant Ledbetter." We review these fact-findings for clear error. See *State v. Wilson*, 315 Ga. 613, 613 (884 SE2d 298) (2023) ("In reviewing the trial court's grant of the motion to suppress, we apply the well-established principles that the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review.") (punctuation and citation omitted).

The State does not dispute that Scheib obtained information from Ledbetter as part of his representation of Ledbetter and that

Scheib then conveyed that information to Detective Leonpacher. And the trial court's findings that Scheib acted "unilaterally" and "without knowledge or permission" of Ledbetter were supported by ample evidence that Ledbetter did not waive his attorney-client privilege, including Scheib's testimony that he did not have any waiver or permission to share information from Ledbetter and Ledbetter's testimony that he never gave Scheib permission to share any information with the detective and did not learn about Scheib's disclosures until 2018.

The State argues, however, that Scheib did not share the information "unilaterally" and without Ledbetter's "knowledge or permission" because, in fact, Ledbetter intended for Scheib to share the information he provided with Detective Leonpacher and thereby implicitly waived his attorney-client privilege. In support of this contention, the State points to "[t]he fact that Scheib disclosed this information while pursuing [a] favorable outcome for Ledbetter." But in the absence of any evidence that the client knew about and approved of the disclosure, an attorney's disclosure alone, even if it

14

was intended to benefit the client, does not establish that such disclosure was authorized. See *Moclaire*, 215 Ga. App. at 363 ("The mere fact that the attorney discussed the communications with others, without evidence that [the client] authorized those discussions, does not prove that [the client] waived the attorney-client privilege.") (citation and punctuation omitted); *McKie v. State*, 165 Ga. 210, 210 (140 SE 625) (1927) ("Communications between client and attorney are excluded from public policy and are incompetent as evidence against the client upon her trial for the homicide of her husband; and this is so, whether such letters [written by the client to her attorney] were voluntarily produced by the attorney to be used against the client, or were surreptitiously or otherwise taken from the possession of the attorney."). See also *Rouse v. State*, 275 Ga. 605, 607 & n.12 (571 SE2d 353) (2002) (affirming the trial court's denial of admission into evidence a tape recording of a witness talking to his attorney, where the "record fail[ed] to establish conclusively" how the defendant obtained the recording but where the attorney "apparently . . . inadvertently

disclosed" the recording and the record was "devoid of any evidence that shows that [the witness] authorized the release of this tape to anyone").[10]

The State further argues that Scheib's testimony that Ledbetter said, "I gotta deal with this" and indicated that he would turn himself in if he heard that there was an arrest warrant is evidence that Ledbetter knew about and implicitly authorized Scheib's meeting with and disclosures to Detective Leonpacher. This argument—that Ledbetter saying he wanted to "deal with this" and avoid pursuit from the "fugitive squad" is an implicit waiver of attorney-client privilege—is strained at best. See *Kennestone Hosp. v. Hopson*, 273 Ga. 145, 148 (538 SE2d 742) (2000) (explaining that

---

[10] In support of this argument, the State cites *United States v. Tyerman*, 701 F3d 552, 559 (8th Cir. 2012), and *United States v. Beltramea*, 2015 U.S. Dist. LEXIS 121195 (N.D. Iowa Sep. 11, 2015). Even assuming we would follow these federal cases in deciding an issue about attorney-client privilege, both cases are distinguishable: there was evidence in both that the defendants knew about their attorneys' disclosures. See *Tyerman*, 701 F3d at 559 (explaining that during plea negotiations, Tyerman helped his attorney find the gun "[a]t the Court's request" and "the County Attorney's request," and concluding that Tyerman implicitly waived the attorney-client privilege as to that information); *Beltramea*, 2015 U.S. Dist. LEXIS at *17-24 (concluding that the defendant waived attorney-client privilege with respect to information that his attorney shared in open court at his sentencing hearing).

16

"[a]n implied waiver is one shown by a party's decisive, unequivocal conduct reasonably inferring the intent to waive," and concluding that there was no implicit waiver in that case) (punctuation and citation omitted). We cannot say that the trial court's finding that Scheib acted without Ledbetter's knowledge or permission was clearly erroneous.[11] We therefore affirm the trial court's holding that Ledbetter's communications with Scheib were protected by the

---

[11] The State also argues in its reply brief that the statement of Ledbetter's new attorney at an August 2020 bond hearing that Ledbetter "had engaged the services of an attorney, Dennis Scheib, and in fact was cooperating and providing information and physical evidence to Detective Leonpacher" shows that Ledbetter authorized the disclosures Scheib made to the detective. First, we note that it does not appear the State made this argument to the trial court, and evidence about what was said during the bond hearing was not introduced into evidence at the hearing on the motion to suppress. See *Middleton v. State*, 316 Ga. 808, 810 n.3 (890 SE2d 713) (2023) (declining to consider an argument that was "never raised in proceedings below"). Even if we did consider this argument, however, we would reject it. This statement from Ledbetter's counsel was not a clear representation on Ledbetter's behalf that he had waived his attorney-client privilege in relation to Scheib's earlier meeting with Detective Leonpacher, and later in the bond hearing, Ledbetter's counsel indicated to the court that Scheib's disclosure of evidence to law enforcement was "among some of the things" that Ledbetter would be raising before the trial court. Even if counsel's assertion that Ledbetter "was cooperating" with the State through Scheib was inconsistent with Ledbetter's assertion that he did not authorize Scheib to make any disclosures to law enforcement, it does not constitute a sufficiently clear statement that Ledbetter authorized Scheib's disclosures to cause us to conclude that the trial court's fact-finding was clearly erroneous.

attorney-client privilege and should be suppressed under OCGA § 24-5-501 (a) (2).

(ii) *Physical Evidence*

The State also argues that even if evidence about the communications between Ledbetter and Scheib that Scheib shared with Detective Leonpacher should be suppressed based on attorney-client privilege, the trial court order should be reversed to the extent it also suppresses physical evidence Scheib gave the detective, such as guns. Notably, however, in his brief and at oral argument before this Court, Ledbetter asserted that the trial court's order does not categorically suppress physical evidence itself and has conceded that the physical evidence is not covered by attorney-client privilege and may be admissible.[12] In other words, the State and Ledbetter agree

---

[12] Specifically, in one of his appellate briefs before this Court, Ledbetter asserted: "The trial court did not exclude the physical evidence from being introduced at trial but it did exclude all privileged evidence that was obtained by the prosecution in violation of Appellee's rights. Thus, if the prosecution can find a lawful way to introduce the physical evidence at trial, same would not violate the trial court's Order." And at oral argument, Ledbetter's counsel was asked: "[I]t seems like you concede that the physical evidence is not covered by attorney-client privilege or any other privilege. Is that your position?" And counsel answered, "In this particular case, yes."

18

on this point.  We accept Ledbetter's interpretation of the trial court

order and hold that the order does not suppress the physical

evidence Scheib provided to Detective Leonpacher.[13]

However, if the physical evidence is admitted at trial, it should

not be linked to Scheib as Ledbetter's attorney.[14]  Ledbetter

asserts—and we agree—that although the trial court's order does

not suppress the physical evidence itself, the trial court order does

prohibit the State from identifying Scheib—as Ledbetter's

attorney—as the source of any physical evidence the State might

seek to introduce.  Specifically, the trial court's order prohibits "the

prosecution as well as all of its witnesses" from using "directly, or

---

[13] To the extent language in the order could be read to suppress the physical evidence itself, we reject that reading.  And because this Court's interpretation of the trial court's order is now law of the case, Ledbetter may not later attempt to rely on that order in an effort to suppress the physical evidence at issue in this appeal.  See *Cartwright v. Caldwell*, 305 Ga. 371, 382 (825 SE2d 168) (2019) ("Under [the law of the case] doctrine, 'any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals.'  OCGA § 9-11-60 (h).  It is well-established that the law of the case doctrine applies to holdings by appellate courts in criminal cases.") (citation and punctuation omitted).

[14] We do not evaluate how the State may be able to admit this physical evidence, such as through a different theory of authentication.

indirectly, any privileged evidence obtained from Attorney Scheib which includes . . . physical evidence provided by Attorney Scheib." The State would violate this prohibition if it introduced at trial the physical evidence Ledbetter gave to Scheib accompanied by testimony or other evidence that the items originated from Scheib (who was serving as Ledbetter's attorney). This is so because the evidence presented at the motion to suppress hearing indicated that Ledbetter (as a client) gave the physical evidence to Scheib (Ledbetter's attorney) as part of his attorney-client communications with Scheib.

Scheib's explanation of the "chrome and black" gun he gave Detective Ledbetter, which is reflected in the recording of the meeting played at the motion to suppress hearing, helps illustrate this point. Scheib's statements to Detective Leonpacher indicate that when Ledbetter gave Scheib this gun, Ledbetter told Scheib it was the gun Miller had when he arrived at the drug transaction and that Miller and Ledbetter struggled over it, eventually resulting in Miller's shooting and death. If the State sought to introduce that

gun into evidence at trial and mentioned that law enforcement officials obtained the gun through Ledbetter's attorney, Scheib, that would constitute an indirect use of "privileged evidence obtained from Attorney Scheib" and would violate the trial court's order. That would be so even if neither Ledbetter's nor Scheib's statements about the gun were repeated to the jury and even if the fact of Scheib's conversations with Ledbetter and Detective Leonpacher were not otherwise made known to the jury. Evidence that Ledbetter's attorney gave law enforcement a gun that was linked to the shooting would be indirect evidence of the communications Ledbetter had with Scheib (his attorney) when he gave Scheib this gun, thereby constituting the type of indirect use of "privileged evidence obtained from Attorney Scheib" the trial court prohibited in its order.[15]

---

[15] We note that it likely would be difficult to present evidence that Ledbetter's attorney Scheib gave any physical evidence to Detective Leonpacher without running afoul of the trial court's directive that "it cannot be mentioned that Attorney Scheib ever met with the police."

The State argues that it should be allowed to present evidence that the gun and other physical evidence came from Scheib and the trial court erred in deciding otherwise. Responding to the State's argument, Ledbetter points to *Williams v. State*, 258 Ga. 281 (368 SE2d 742) (1988), and maintains that the trial court's suppression of any mention of his attorney as the source of any physical evidence is proper. We agree with Ledbetter. In *Williams*, the State presented evidence to the jury that the attorney of Williams, a criminal defendant, revealed the location of a murder victim's body to law enforcement. See 258 Ga. at 284. This Court explained that the attorney, Flanagan, likely learned this information from Williams and reasoned that "if the state was *not* trying to create an inference that the victim's body was discovered because Williams had revealed its location to his attorney, it was not necessary to tell the jury that Flanagan was Williams' attorney." Id. We therefore disapproved of the State's presenting evidence that the defendant's attorney was the source of the evidence used against the defendant. See id.

22

It is true, as the State points out, that this Court in *Williams* ultimately held that evidence of Williams's attorney's involvement was harmless in light of the strength of the evidence against Williams. See 258 Ga. at 285. But the reasoning in *Williams* is nonetheless persuasive here. As with admitting evidence of the attorney's knowledge of the body's location in *Williams*, admitting evidence that Ledbetter's attorney was the source of the physical evidence given to Detective Leonpacher would allow the jury to draw inferences about Ledbetter's communications with his attorney Scheib that should not be permitted because of the attorney-client privilege. To put it another way, the only reason Scheib gave Detective Leonpacher the physical items was because of their connection to the shooting, and the only reason Scheib was aware of the items' connection to the shooting was through his privileged communications with his client. And the information discussed in those privileged communications—whether presented directly through Scheib's statements about what Ledbetter said or presented indirectly through inferences that can be drawn from the fact that

23

Ledbetter shared physical evidence of the crimes with his attorney—

is what the attorney-client privilege protects from the jury's view.[16]

Thus, we affirm the trial court's suppression of evidence that Scheib

(as Ledbetter's attorney) was the source of the physical evidence.[17]

(iii) *Derivative Evidence*

---

[16] Other states have reached a similar conclusion. For example, in *State v. Olwell*, 64 Wash.2d 828 (394 P2d 681) (1964), which *Williams* cited with approval, the Supreme Court of Washington held that when an attorney surrenders physical "evidence he has in his possession," the prosecution "should be well aware of the existence of the attorney-client privilege" and "when attempting to introduce such evidence at the trial, should take extreme precautions to make certain that the source of the evidence is not disclosed in the presence of the jury." Id. at 834. That court reasoned that by "allowing the prosecution to recover such evidence, the public interest is served, and by refusing the prosecution an opportunity to disclose the source of the evidence, the client's privilege is preserved and a balance is reached between these conflicting interests." Id. See also *Sanford v. State*, 21 SW3d 337, 344 (Tex. App. 2000) (explaining that "several other jurisdictions hold that the State may not, when introducing the evidence received from counsel, reveal the source of the evidence in the presence of the jury because it would violate the attorney-client privilege" and concluding that "this balancing of interests is the correct approach"); *State v. Abdullah*, 348 P3d 1, 103-104 (158 Idaho 386) (2015) (collecting cases prohibiting presenting the defendant's attorney as the source of physical evidence, but also explaining that if the location of physical evidence "was revealed to defense counsel by a non-client third party, then the attorney-client privilege does not prohibit the State from proving . . . where and how the evidence was located").

[17] We take no position, however, on the question of whether Ledbetter could open the door to such evidence by raising a chain-of-custody or similar challenge at trial.

24

The State also argues that the trial court erred by suppressing "derivative evidence related to Scheib's disclosures," such as testimony from witnesses later located with information Scheib provided to Detective Leonpacher. See Black's Law Dictionary (11th ed. 2019) (defining "derivative evidence" as "[e]vidence that is later discovered by using evidence that was illegally obtained"). We disagree, however, with the premise of the State's argument in this regard, because the trial court's order does not suppress such evidence.

As discussed in subdivision (ii) above, the trial court's order prohibits "the prosecution as well as all of its witnesses" from "indirectly" using "privileged information obtained from Attorney Scheib." But the order does not otherwise restrict law enforcement's use of the privileged information to aid further investigation. Moreover, the text of the order does not mention "derivative evidence" and neither OCGA § 24-5-501 (a) (2) nor any of the cases the trial court cited in the order expressly suppress derivative

evidence on the basis of attorney-client privilege.[18]  The order also does not hold that Ledbetter's constitutional rights were violated, which is often a pre-requisite for the suppression of derivative evidence.  See *State v. Chulpayev*, 296 Ga. 764, 776 (770 SE2d 808) (2015) ("The broad exclusionary rule, with its fruit of the poisonous tree extension, operates only in limited circumstances, usually only where a defendant's constitutional rights have been violated."). Finally, at oral argument before this Court, Ledbetter's counsel appeared to acknowledge that the trial court's order does not suppress "derivative evidence," while emphasizing the court's prohibition on the indirect use of the privileged information discussed in subdivision (ii) above.[19]  We accordingly conclude that

---

[18] We acknowledge that the title of the order broadly describes its contents as an order "GRANTING THE SUPPRESSION OF ANY AND ALL EVIDENCE, AS WELL AS DERIVATIVE EVIDENCE."  However, for the reasons explained in this subdivision, we do not view the nomenclature in the title of the order as prevailing over the substance of the order.  See *Sotter v. Stephens*, 291 Ga. 79, 82 (727 SE2d 484) (2012) (explaining that although it was titled "Final Order and Judgment," the order was not final because the substance of the order indicated that it was interlocutory).

[19] Specifically, when counsel was asked at oral argument about what derivative evidence was suppressed by the trial court's order, he answered: "I

26

the trial court's order does not prohibit the State from seeking to introduce evidence that may be obtained from the use of privileged information Scheib disclosed to Detective Leonpacher, so long as that evidence does not reveal communications protected by the attorney-client privilege and so long as the State does not identify Scheib as the original source of any such evidence.

*

In light of the discussion above, we affirm the trial court's order granting Ledbetter's motion to suppress any evidence that attorney Scheib gave to Detective Leonpacher that is protected by Ledbetter's attorney-client privilege.

2. *The Cross-Appeal, Case No. S23X0901*

As part of the investigation into the murders, law enforcement officers completed two search warrants for Ledbetter's cell phone

---

didn't take derivative the way . . . I thought it was indirect or direct. And by that I meant, OK, we'll exclude all the statements the trial court is saying. So you can't say what appellee said to the lawyer. But you can say that the lawyer turned it over to us. And I thought that's the indirect evidence. . . . And . . . *Williams* says exactly what to do. Omit everything directly and indirectly that came from the lawyer for the client, and then the prosecution has to figure out a way to get it in. And that's how I look at it."

27

records. A February 2016 search warrant obtained cell phone records related to Miller's murder, and a February 2020 search warrant obtained cell phone records related to Stinchcomb's murder.[20] Ledbetter moved to suppress these cell phone records, arguing, among other things, that the search warrants were not supported by probable cause. The trial court held a hearing on the motion to suppress, during which the search warrant affidavits and applications were admitted into evidence.[21] The trial court then

---

[20] The phone records related to Stinchcomb's murder were first obtained with an "Order Releasing Cellular Telephone Records" issued in March 2015. The State's attorney explained to the trial court that law enforcement completed a search warrant for the same phone records in February 2020 due to the United States Supreme Court's issuing *Carpenter v. United States*, 138 SCt 2206 (201 LE2d 507) (2018). Ledbetter raised objections to the March 2015 order in the trial court and again on appeal, but we need not address those because we conclude that Ledbetter's challenges to the February 2020 warrant fail. Ledbetter does not allege that the March 2015 order supplied any information different from the information gathered with the February 2020 search warrant. Thus, we would still conclude that the trial court properly denied Ledbetter's motion to suppress these records even if we conclude that the March 2015 order was invalid. See, e.g., *McKinney v. State*, 307 Ga. 129, 138 (834 SE2d 741) (2019) (explaining that we did not need to decide whether admitting evidence to prove other purposes under OCGA § 24-4-404 (b) was proper, when we had determined that the evidence was admissible to prove identity).

[21] There is no evidence in the record that the magistrates who granted the warrants were presented with anything more than the applications and

denied Ledbetter's motion to suppress, concluding, among other things, that the search warrants were supported by probable cause. Ledbetter appeals this order. As explained more below, we rely on well-settled precedent applying the Fourth Amendment to the United States Constitution to conclude the warrants were supported by probable cause, and we also reject Ledbetter's other challenges to the warrants.

A search warrant will issue only based upon an oath or affirmation stating "facts sufficient to show probable cause that a crime is being committed or has been committed." OCGA § 17-5-21 (a). See U.S. CONST. amend. IV (stating, in pertinent part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized").

---

affidavits in support of the requested warrants, and Ledbetter and the State agreed that the issues presented in Ledbetter's motion to suppress should be decided based only on the warrant application and affidavit. See *Messerschmidt v. Millender*, 565 U.S. 535, 568 (132 SCt 1235, 182 LE2d 47) (2012) (explaining that a court reviewing the validity of a warrant should consider "only information brought to the magistrate's attention").

An affidavit supporting a search warrant generally "should establish a connection between the defendant and the property to be searched and a link between the property and any criminal activity." *United States v. Mathis*, 767 F3d 1264, 1276 (11th Cir. 2014) (citation and punctuation omitted). In determining if a warrant is supported by probable cause, the magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit" supporting the warrant "there is a fair probability that contraband or evidence of a crime will be found" in the place requested to be searched. *Perez v. State*, 316 Ga. 433, 440 (888 SE2d 526) (2023) (citation and punctuation omitted). A magistrate may "draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant." *Illinois v. Gates*, 462 U.S. 213, 236 (103 SCt 2317, 76 LE2d 527) (1983). See also *State v. Britton*, 316 Ga. 283, 286 (888 SE2d 157) (2023).

"On appellate review, our duty is to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant." *Perez*, 316 Ga. at 440. "[I]n passing on

the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention." *Messerschmidt v. Millender*, 565 U.S. 535, 568 (132 SCt 1235, 182 LE2d 47) (2012). The magistrate's determination of probable cause is "entitled to substantial deference." *Perez*, 316 Ga. at 440. "[E]ven doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper." Id.

(a) *February 2016 Search Warrant Related to Miller's Murder*

With the February 2016 search warrant, the State sought subscriber information, call detail records, cell tower locations, and other information related to three phone numbers from January 1 through February 3, 2016, to find evidence of murder. Detective Leonpacher completed the affidavit, providing the following information under oath. He had been employed by the Atlanta Police Department since July 2002 and worked in the Homicide Unit. Miller was shot in Atlanta on January 19, 2016. "A tip from the Cobb County Police Department indicated that . . . Ledbetter admitted to a third-party that he shot . . . Miller." After the shooting

31

and before he died, Miller called his cousin, Shera Lett, from the hospital, saying that he wanted to talk to her and did not believe he would survive his injuries. When Lett came to the hospital, Miller told her that "he met a man he knows as 'John B' or 'Lil' John' to purchase marijuana," but then "John" "either shorted or provided fake marijuana" and shot Miller when Miller confronted him; "John" then drove away with Miller's backpack.

Detective Leonpacher's affidavit further averred that Scheib, Ledbetter's attorney, met with him and "proffered information on behalf of his client," including that Ledbetter met with Miller to sell marijuana, Miller tried to rob him, and Ledbetter grabbed the gun and "fired two shots at Miller." Scheib also "turned over evidence from his client that was related to the shooting including the firearm used to shoot the victim and the victim's light blue Jansport backpack."[22] Detective Leonpacher then obtained arrest warrants

---

[22] Ledbetter does not argue that law enforcement's reliance on statements and physical evidence gathered from Scheib and detailed in the affidavit was improper or is a basis to suppress the cell phone records. We do not decide this issue, but note that, as explained above in Divisions 1 (c) (ii)

for Ledbetter for murder and other crimes, and Ledbetter turned himself in.

In light of this information, the application said the following:

It is now requested that a Search Warrant be issued by the Magistrate Court of Fulton County to compel the wireless phone service provider of:

- John Ledbetter (accused)
- Jeremy Miller (victim)
- Shera Lett (dying declaration witness)

which is T-Mobile/MetroPCS, to produce the call detail records (CDR) associated with those numbers. The records are material, relevant, and evidence in the ongoing criminal investigation into the crime of Murder, which is in violation of OCGA § 16-5-1.

CDR's, including the cell towers utilized during each call, can be used to aid in approximating the area from which calls were made and received and it is believed that the CDR's for these three will illustrate that:

- John Ledbetter communicated with the victim prior to their meeting during which Ledbetter shot the victim AND that his phone showed activity on cell towers in the same general geographic area as the crime scene at/about the time of the shooting.

---

and (iii), the trial court's order granting Ledbetter's motion to suppress information given to Detective Leonpacher by Scheib in violation of Ledbetter's attorney-client privilege does not also have the effect of suppressing physical or derivative evidence.

- Jeremy Miller communicated with Ledbetter prior to the meeting/shooting.
- Shera Lett received a call from Grady Hospital prior to hearing the dying declaration from Miller.

The next paragraph listed the information requested, including subscriber information and call detail records, for:

the MetroPCS/T-Mobile wireless telephone numbers of:
504-223-4160
470-259-8589
404-671-5486

These are the only phone numbers, other than 911, mentioned in the warrant affidavit and application. The affidavit and application were presented in the magistrate court of Fulton County and were signed by a judge.

(i) Ledbetter argues that the warrant was not supported by probable cause because the affidavit and application failed to connect any of the target numbers to criminal activity or to Ledbetter. Thus, we must determine whether, "given all the circumstances set forth in the affidavit," the magistrate had a "substantial basis" for concluding that there was a fair probability that evidence of the murder would be found in the records of the

three phone numbers listed in the warrant. *Perez*, 316 Ga. at 440. We conduct this inquiry keeping in mind that the magistrate may draw "reasonable inferences" from the affidavit, *Gates*, 462 U.S. at 236, and that the magistrate's decision is entitled to "substantial deference," *Perez*, 316 Ga. at 440.

Here, we have no trouble concluding that the affidavit offered a substantial basis for the magistrate to conclude that there was a fair probability that evidence of Miller's murder would be found on Ledbetter's cell phone. According to the affidavit, Miller said that he met someone named "John" to buy marijuana, and that John shot him. Further, Ledbetter told someone that he shot Miller, and Scheib, Ledbetter's attorney, said that Ledbetter met Miller to sell marijuana and fired shots at Miller at this meeting. The affidavit then said that the requested phone records were expected to show that Ledbetter "communicated with the victim prior to their meeting" and was around the crime scene at the time of the shooting. These circumstances support the common-sense inference that Ledbetter used his phone to contact Miller to set up the meeting to

sell Miller drugs, and at that meeting, Ledbetter shot Miller. See *United States v. Eggerson*, 999 F3d 1121, 1127 (8th Cir. 2021) (concluding that "it was not unreasonable for [the state magistrate] to infer that cell phones were being used in connection with the alleged drug dealing") (citation and punctuation omitted).

We further conclude that, although the affidavit and application did not state expressly that one of the three numbers for which records were sought was Ledbetter's phone number, the magistrate could reasonably infer from the affidavit that one of the target numbers belonged to Ledbetter. See *Taylor v. State*, 303 Ga. 57, 61 (810 SE2d 113) (2018) (rejecting Taylor's argument that the warrant was not supported by probable cause because it failed to state expressly that the address to be searched (1751 Bergen Court) was Taylor's address; in light of the other information contained in the affidavit, "the magistrate, making a practical and common-sense decision, was entitled to infer that there was a 'fair probability' that Taylor lived at 1751 Bergen Court"); *United States v. Hunter*, 86 F3d 679, 681 (7th Cir. 1996) ("The affidavit's failure to state explicitly

36

that Palace Court was Hunter's residence, by itself, is not a fatal flaw.").

In particular, the affidavit and application indicated that law enforcement had opportunities to learn Ledbetter's phone number by noting that Scheib "proffered information on behalf of his client" to Detective Leonpacher and that Ledbetter turned himself in for arrest. The warrant application then asked the court "to compel the wireless phone service provider of," listed three people—Ledbetter, Miller, and Lett—in separate bullet points, and said their phone service provider was T-Mobile/MetroPCS. The warrant application used a similar sequence and format in the next paragraph when explaining what was expected to be found in the phone records of "these three." Again, a bulleted list was used, with one bullet point corresponding to each person listed above:

- John Ledbetter communicated with the victim [Miller] prior to their meeting during which Ledbetter shot the victim AND that his phone showed activity on cell towers in the same general geographic area as the crime scene at/about the time of the shooting.

37

- Jeremy Miller communicated with Ledbetter prior to the meeting/shooting.
- Shera Lett received a call from Grady Hospital prior to hearing the dying declaration from Miller.

Importantly, each bullet point listed information that would likely be found on a particular person's phone. For example, Ledbetter's communication with Miller would be expected to be found on Ledbetter's phone, just as Miller's communication with Ledbetter would be expected to be found on Miller's phone. Additionally, the first bullet point expressly referred to "his phone" in explaining the expectation that the requested record would show that Ledbetter's phone was in the area of the shooting around the time of the shooting. That is not surprising, given that the location of Ledbetter's phone is something one would expect to find in the records of Ledbetter's phone number.

Finally, the application listed the three "Metro PCS/T-Mobile wireless telephone numbers" to be searched:

504-223-4160
470-259-8589
404-671-5486

This format mirrors the two earlier bulleted paragraphs that listed three separate people (Ledbetter, Miller, and Lett, each time listed in that order), and in this way the format of this request ties the three listed phone numbers (the only non-emergency phone numbers mentioned in the warrant) to the three listed people (who were in two separate places listed in the same order) and with the sets of information law enforcement expected to find associated with those three listed people. There was nothing in the affidavit and application to lead the magistrate to believe that the three phone numbers were associated with people other than the three listed people, or that law enforcement was mistaken as to which numbers belonged to the three people.

In light of "all the circumstances" presented here, the magistrate could have reasonably inferred that the three target phone numbers belonged to the three listed individuals, meaning—as relevant to this case—one of those numbers belonged to

39

Ledbetter.[23]  See *Taylor*, 303 Ga. at 61 (concluding that "the magistrate could easily have inferred a connection between Taylor and the residence at 1751 Bergen Court" in light of "all the circumstances," including that the affidavit and its attachment described the location to be searched "as the residence located at 1751 Bergen Court," described the crimes "as occurring at 'Taylor's residence,'" asserted that "'there is probable cause to believe that a crime has been committed . . . at *said location*,'" and requested the warrant to gather evidence from "the *crime scene*") (emphasis in original); *Hunter*, 86 F3d at 681 ("Attachment A to the search warrant and affidavit described the place to be searched as '[t]he residence at 510 Palace Court, Schaumburg, Illinois. . . .' The affidavit referred four times to Hunter's residence; it made no reference to any other place connected to Hunter.  Although Hunter

_____

[23] Ledbetter does not argue that the warrant was not supported by probable cause because it cannot be determined *which* of the three target numbers belonged to him; he argues only that the warrant did not tie him to *any* of the target numbers.  We note, however, that given the way the information was presented—with Ledbetter coming first in the earlier two sets of bullet points—the magistrate could have reasonably inferred that the first phone number in the final list belonged to him.

correctly notes that the affidavit did not explicitly state that 510 Palace Court was his residence, that is the only logical conclusion supported by a common-sense reading of the affidavit.").

Therefore, "the magistrate, making a practical and common-sense decision, was entitled to infer that there was a 'fair probability'" that one of the target phone numbers belonged to Ledbetter and that evidence of the alleged murder would be found in the phone number's records. *Taylor*, 303 Ga. at 61. Of course, Ledbetter's argument on this point would have been more easily resolved if the drafter of the warrant had taken the small, but important, extra step of expressly linking the three listed people with the three listed phone numbers.[24] But given all of the

_____

[24] We encourage law enforcement to provide such information on the face of the warrant application or affidavit to alleviate any doubt that those aspects of the warrant comply with the United States Constitution and applicable Georgia law. And we emphasize that this case should not be read as a holding that an inference connecting a target phone number with a name listed in a warrant will always be possible or will always support probable cause, particularly when a warrant references multiple phone numbers and multiple people. See *Taylor*, 303 Ga. at 60 (declining to adopt the "broad rule" that when an affidavit describes one place connected to a suspect and lists a specific address to be searched, a connection between the address and the suspect will

circumstances, and especially in light of the "substantial deference" we owe the magistrate's determination of probable cause, we conclude that "the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant." *Perez*, 316 Ga. at 440.[25]

always be inferred as "the only logical conclusion supported by a common-sense reading of the affidavit") (citation and punctuation omitted).

[25] The specially concurring opinion argues that this Court should forgo considering whether this warrant was supported by probable cause, overrule *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992), and apply a good-faith exception to affirm the trial court's denial of Ledbetter's motion to suppress the cell phone records. We disagree. The specially concurring opinion contends that we did something similar in *Woodard v. State*, 296 Ga. 803 (771 SE2d 362) (2015), where we overruled *Heard v. State*, 261 Ga. 262 (402 SE2d 438) (1991), thereby clarifying that trial counsel's performance was not deficient, rather than attempting to distinguish *Heard* or resolve the ineffective-assistance-of-counsel claim on the prejudice prong. See *Woodard*, 296 Ga. at 810, 814 (3) (b) & n.5. But *Woodard* explained that, under the circumstances of the case, it was "particularly appropriate" for us to "address whether there was error under *Heard*, which involve[d] deciding whether *Heard* [was] good law." Id. at 810 (3) (b) n.5. This was because, as we explained, it would have been a stretch "to distinguish th[e] case from *Heard*," and whether the appellant suffered prejudice from the alleged deficient performance was a "very close" call. Id. at 810, 814 (3) (b) & n.5. Here, by contrast, we can readily resolve the case by applying existing precedent. And because the application of this existing precedent clearly shows that the warrants in this case were supported by probable cause, Ledbetter's challenges to the warrants fail, and we need not consider whether to overrule *Gary* to make a good-faith exception available for warrants that are not supported by probable cause.

(ii) Ledbetter next argues that the warrant is invalid under OCGA § 16-11-66.1 (c), which allows the "state-wide application or application as provided by the laws of the United States" of search warrants for production of certain communications and records "when issued by a judge with jurisdiction over the criminal offense under investigation and to which such records relate." Ledbetter points out that this search warrant was signed by a magistrate judge, the alleged offense is murder, and magistrate judges do not have jurisdiction over murder trials. Ledbetter did not, however, raise this argument in his motion to suppress, and instead raises it for the first time in this pretrial appeal. Because it was not raised before the trial court, it was not ruled on in the trial court's order denying Ledbetter's motion to suppress that is the subject of this appeal. We decline to decide this issue in the first instance. See *Middleton v. State*, 316 Ga. 808, 810 n.3 (890 SE2d 713) (2023) (declining to consider an argument that was "never raised in proceedings below" and was raised for the first time in a pretrial appeal of a motion to suppress).

(b) *February 2020 Search Warrant Related to Stinchcomb's Murder*[26]

The February 2020 search warrant sought subscriber information, call detail logs, cell tower locations, and other information for the phone number 504-402-6292 (the only non-emergency phone number mentioned in the warrant) from February 1 through February 28, 2015, to search for evidence related to felony murder and attempt to sell marijuana. The warrant requested information "within the custody and control of Verizon Wireless at

---

[26] The State argues that Ledbetter has not preserved for our review any of his challenges to the February 2020 search warrant because he did not raise them in a "written motion" in the trial court. See OCGA § 17-5-30 (b) (requiring motions to suppress illegally seized evidence to "be in writing and state facts showing that the search and seizure were unlawful"). However, Ledbetter did raise these challenges in writing. Although they were filed in what was titled a "post-hearing brief," rather than an express amendment to his motion to suppress, the State raised no objection in the trial court to Ledbetter's apparent use of this brief to amend his motion, and although the trial court did not expressly address each challenge in its order denying Ledbetter's motion to suppress, it clearly ruled that the February 2020 warrant was supported by probable cause and thus (at least implicitly) addressed Ledbetter's challenges to that warrant. See *Cowart v. State*, 294 Ga. 333, 338 (751 SE2d 399) (2013) (explaining that "[a] brief normally does not amend a motion for new trial to add new grounds," but the trial court may "in its discretion" allow the motion to be amended "by treating an enumeration of error raised only in the brief as if it had been raised in the motion"). In any event, we need not decide this question definitively, because these challenges all fail for the reasons discussed below.

180 Washington Valley Road, Bedminster, NJ 07291," for the target phone number, which was described as a "Sprint wireless telephone number(s)." The warrant, signed by a Fulton County superior court judge,[27] said that an affidavit was "made before me by Investigator Bernice Higgins, an officer charged with the duty of enforcing the Criminal Laws." The affidavit was completed under oath by Investigator Higgins and was based on information she received "from reports provided by the Atlanta Police Department."

In the affidavit, Investigator Higgins averred the following. Stinchcomb was shot in Atlanta on February 13, 2015. After Stinchcomb was shot, "law enforcement officers received information" that Ledbetter and Jayvias Lott were involved in a drug deal. Ledbetter explained that a man to whom he normally sells marijuana "connected him to a new buyer named 'Scotty.'" Ledbetter further "explained that 'Scotty' and LEDBETTER began

---

[27] In the legal analysis that follows, we will refer to the judge who signed the warrant as a "magistrate," both because much of our law uses that term when discussing the issuance of warrants, and to distinguish the judge who signed the warrant from the judge who denied Ledbetter's motion to suppress.

exchanging phone calls" and eventually set up a meeting for the sale of marijuana. During this drug transaction, Stinchcomb attempted to rob the men, and Lott shot Stinchcomb. The next paragraph further explained:

> Over the course of the investigation, specifically when speaking with JOHN LEDBETTER, it was determined that LEDBETTER communicated with JAYVIAS LOTT, AKA "Scotty," before and after the homicide via cellphone. Furthermore, it was through this communication that LEDBETTER and the two potential purchasers facilitated this attempted purchase of multiple pounds of marijuana.
>
> The evidence we expect to obtain from the cell phone dump includes but not limited to: corroborate JOHN LEDBETTER'S version of events, and to identify other dates and times JOHN LEDBETTER would have been in communication with other involved parties.

(i) Similar to his complaint about the February 2016 search warrant related to Miller's shooting, Ledbetter argues that this search warrant was not supported by probable cause because it failed to connect the target phone number to the alleged crimes or Ledbetter. Thus, we again consider whether, "given all the circumstances set forth in the affidavit," the magistrate had a "substantial basis" for concluding that there was a fair probability

that evidence of the murder would be found in the records of this phone number. *Perez*, 316 Ga. at 440.

Information in the affidavit and application provided the magistrate a substantial basis for concluding that Ledbetter's phone contained evidence of the charged crimes. According to the affidavit, Ledbetter said that he and Lott "began exchanging phone calls" and eventually set up a drug transaction. At this meeting, Stinchcomb attempted to rob the men, and Lott shot Stinchcomb in the head. This information supports the common-sense inference that evidence related to the attempted drug sale and shooting could be located on Ledbetter's phone. See *Eggerson*, 999 F3d at 1127.

Although the February 2020 warrant does not expressly state that the target number was Ledbetter's phone number, there was sufficient information in the affidavit to allow the magistrate to infer that the number belonged to Ledbetter. Specifically, the application first listed the target phone number (the only non-emergency phone number mentioned). Then the affidavit said that Ledbetter "explained that [Lott] and LEDBETTER began exchanging phone

47

calls" and set up the meeting where the shooting then took place, showing that law enforcement was interested in Ledbetter's phone use and had an opportunity to learn Ledbetter's phone number when talking to Ledbetter about his phone calls. The next paragraph then referenced this information provided by Ledbetter in summarizing what law enforcement learned from speaking with Ledbetter (that Ledbetter talked to Lott "before and after the homicide via cellphone" and set up the drug deal) before explaining what law enforcement "expected[ed] to obtain from the cell phone dump." The anticipated information was information one would expect to find on Ledbetter's phone, including information that could "corroborate JOHN LEDBETTER'S version of the evidence" and "identify other dates and times JOHN LEDBETTER would have been in communication with other involved parties."

That the affidavit explained that Ledbetter described to law enforcement his cell phone use around the time of the shooting and then said that law enforcement expected that "the cell phone dump" requested would corroborate Ledbetter's story and reveal

48

Ledbetter's additional contacts further supports the reasonable inference that the target number belonged to Ledbetter. See *Taylor*, 303 Ga. at 61 ("[W]hen the attachment says that evidence of the alleged crimes may be found at "said location," which was particularly described as 1751 Bergen Court, and describes Taylor's house as the crime scene, we think that the magistrate could have reasonably inferred the "crime scene" was 1751 Bergen Court."); *Hunter*, 86 F3d at 681.

Thus, in light of all of the information provided to the magistrate, and again keeping in mind the substantial deference we owe to the magistrate's determination, we conclude that "the magistrate, making a practical and common-sense decision, was entitled to infer that there was a 'fair probability'" that the target phone number belonged to Ledbetter and that evidence of the alleged murder would be found in the number's phone records. *Taylor*, 303 Ga. at 61.

(ii) Ledbetter next argues that the warrant and affidavit failed to establish probable cause because the target number is identified

49

as a "Sprint Wireless Telephone Number" but the records to be searched are alleged to be "located within the control of Verizon Wireless." However, this mismatch of cell phone providers is an example of a "technical irregularity," and "[n]o search warrant shall be quashed or evidence suppressed because of a technical irregularity not affecting the substantial rights of the accused." OCGA § 17-5-31. See also *Dent v. State*, 303 Ga. 110, 117 (810 SE2d 527) (2018) ("Mere typographical or clerical errors do not ordinarily provide a basis to suppress evidence.").

Here, the phone number sought to be searched was clearly provided, and whether it was a number serviced by Sprint or Verizon did not affect Ledbetter's rights. See *Carson v. State*, 314 Ga. App. 515, 516 (724 SE2d 821) (2012) (concluding that the affidavit's identification of "another individual as the suspected shooter in a paragraph summarizing the officer's findings" did not "destroy the integrity of the affidavit or the validity of the warrant" where Carson was correctly identified as the suspected shooter in the remainder of the six-page affidavit). Thus, Ledbetter's argument fails.

(iii)    Ledbetter further argues that the affidavit is faulty because the "entire substance" of the affidavit is hearsay.  However, hearsay may be used in affidavits in support of search warrants.  See OCGA § 24-1-2 (c) (5) (explaining that generally "[t]he rules of evidence, except those with respect to privileges" do not apply in "[p]roceedings for the issuance of . . . search warrants").  It is the duty of the magistrate in determining if the warrant is supported by probable cause to consider "the veracity and basis of knowledge of persons supplying hearsay information."  *Britton*, 316 Ga. at 286 (citation and punctuation omitted).  See also *Lewis v. State*, 255 Ga. 101, 105 (335 SE2d 560) (1985) ("The rule in Georgia has been that an affidavit supporting a search warrant may be based on hearsay information as long as there is a substantial basis for crediting the hearsay.").  Magistrates may generally presume that "local law enforcement officials participating in common investigation are reliable informants and their information may be relied on to establish probable cause for the issuance of search warrants." *Pollard v. State*, 236 Ga. 587, 589 (224 SE2d 420) (1976).  See also

*Britton*, 316 Ga. at 294 ("[W]hen Detective Jackson's Affidavit includes information obtained from another officer working on the investigation, the magistrate was entitled to consider such hearsay evidence.").

In this case, the affiant explained that she received the information in the affidavit "from reports provided by the Atlanta Police Department." Ledbetter offers no compelling reason for the magistrate to doubt the reliability of the officer who completed the affidavit or the police reports on which she relied, and his argument fails.[28]

(iv)   Finally, Ledbetter argues that the affidavit does not establish that the affiant, identified as "Investigator Bernice Higgins, an officer charged with the duty of enforcing the Criminal Laws," satisfies OCGA § 17-5-20 (a), which says:

---

[28] Ledbetter also argues in passing that because the affidavit does not indicate the dates of the reports relied on by the affiant, there is a risk of "staleness." However, Ledbetter offers no reason to believe that the phone records sought would no longer contain evidence related to the charged crimes. See *Rawls v. State*, 310 Ga. 209, 222 (850 SE2d 90) (2020) ("Staleness as [it] relates to probable cause is measured by the probability that the thing to be seized is located at the place to be searched.") (citation and punctuation omitted).

> A search warrant may be issued only upon the application of an officer of this state or its political subdivisions charged with the duty of enforcing the criminal laws or a currently certified peace officer engaged in the course of official duty, whether said officer is employed by a law enforcement unit of:
> (1) The state or a political subdivision of the state; or
> (2) A university, college, or school.

Although the affidavit clearly identifies Investigator Higgins as "an officer charged with the duty of enforcing the Criminal Law," Ledbetter argues that the warrant was required to identify her as an "officer of this state." However, there was no reason for the magistrate to believe that Investigator Higgins, who swore out this affidavit "before" this magistrate in this state about a shooting that happened in this state, was not an officer of this state. Ledbetter's "hypertechnical argument" in this regard fails. See *Perez*, 316 Ga. at 440 ("The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life.") (citation and punctation omitted).

Because none of Ledbetter's challenges to the February 2016 or February 2020 search warrants have merit, we affirm the trial court's denial of his motion to suppress.

*Case No. S23A0900 and Case No. S23X0901 affirmed. All the Justices concur, except Boggs, C.J., Peterson, P.J., and LaGrua, J., who concur specially in Divisions (2) (a) (i) and (2) (b) (i).*

BETHEL, Justice, concurring.

Because I believe it represents a faithful application of the law, I join the majority opinion in full. I write separately to note my agreement with the concerns raised in Presiding Justice Peterson's special concurrence regarding the confused state of our decisional law brought on by our decision in *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992). Like the Presiding Justice, I recognize *Gary's* imperiled and untenable position in our law. While the majority opinion demonstrates that we need not overrule *Gary* to decide the case at hand, the "mess" the Presiding Justice describes is due to be cleaned up.

I am authorized to state that Justice Warren, Justice McMillian, and Justice Pinson join in this concurrence.

PETERSON, Presiding Justice, concurring specially.

Over 30 years ago, this Court invented a new version of the exclusionary rule — a version that excluded more evidence than the federal version. See *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992) (holding that OCGA § 17-5-30 created a Georgia statutory exclusionary rule that did not contain the good faith exception to the federal exclusionary rule recognized in *United States v. Leon*, 468 U.S. 897 (104 SCt 3405, 82 LE2d 677) (1984)). Several years ago, we emphatically determined that *Gary* was wrongly decided. See *Mobley v. State*, 307 Ga. 59, 72-75 (4) (a) (834 SE2d 785) (2019). But we could not overrule *Gary*'s holding prohibiting Georgia courts from applying *Leon*, however, because *Mobley* did not involve a claim to which *Leon* could apply. See id. at 76 (4) (a) n.21.

Now, after more than three decades of Georgia courts excluding evidence due only to our misbegotten invention in *Gary*, such a case squarely presents itself. But instead of finishing the job we started in *Mobley* (and have taken further in other contexts since then), the majority chooses to leave *Gary*'s holding — now admittedly wrong

56

and based on reasoning no longer followed in any other respect —

binding on all Georgia courts. I cannot and do not agree with that

decision, and so I do not join Divisions (2) (a) (i) and (2) (b) (i). But

because I would overrule whatever vestiges of *Gary* still remain and

apply *Leon*'s good faith exception, I concur in the judgment of those

divisions. I join the remainder of the decision of the Court in full.

The officers who searched the defendant's phone did so in good

faith reliance on the search warrant. Under federal law, this renders

the exclusionary rule inapplicable even if the warrant was not

supported by probable cause. See *Leon*, 468 U.S. at 919-920 (III) (B).

But we held over 30 years ago that OCGA § 17-5-30 requires

exclusion of all evidence seized with a warrant unsupported by

probable cause, regardless of whether a federal good faith exception

might have applied. See *Gary*, 262 Ga. at 574-575. Subsection (a) of

that statute provides as follows:

> A defendant aggrieved by an unlawful search and seizure may move the court for the return of property, the possession of which is not otherwise unlawful, and to suppress as evidence anything so obtained on the grounds that:

(1) The search and seizure without a warrant was illegal; or

(2) The search and seizure with a warrant was illegal because the warrant is insufficient on its face, there was not probable cause for the issuance of the warrant, or the warrant was illegally executed.

OCGA § 17-5-30 (a). And subsection (b) provides in relevant part that "[i]f the motion is granted the property shall be restored, unless otherwise subject to lawful detention, and it shall not be admissible in evidence against the movant in any trial."

In *Gary*, this Court interpreted OCGA § 17-5-30 as an "unequivocal expression of [the Legislature's] desire that evidence seized by means of a warrant that is not supported by probable cause be suppressed." *Gary*, 262 Ga. at 575. This interpretation rejected the possibility of exceptions to the exclusionary rule and, in doing so, rejected the good faith exception, which would otherwise permit the introduction of evidence that officers obtained by acting in reasonable reliance on a warrant issued by a neutral and detached magistrate but that ultimately lacked probable cause. See id. at 574.

This reasoning, of course, did not turn on anything specific to warrants lacking probable cause. The structure of the statute applies the statute's provisions equally to each of the four enumerated ways in which a search and seizure may have been unlawful: (1) it was done illegally without a warrant, (2) it was done illegally with a warrant because the warrant was insufficient on its face, (3) it was done illegally with a warrant because the warrant was unsupported by probable cause, and (4) it was done illegally with a warrant because the warrant was illegally executed. See OCGA § 17-5-30 (a). Under *Gary*'s reasoning, if any of these four enumerated bases of unlawfulness is present, the evidence must be excluded.

Twenty-seven years later, we repudiated *Gary*'s interpretation of the statute. In *Mobley*, we "disavow[ed] the unsound reasoning of *Gary*," limited its application only to the *Leon* good faith exception at issue there, and concluded that OCGA § 17-5-30 meant "what it most naturally and reasonably is understood in context to mean — it establishes a procedure for applying the exclusionary rule but does

not itself require the suppression of any evidence." 307 Ga. at 75 (4) (a). But we could not reach the question of overruling the *Leon* holding, because the facts of *Mobley* would not warrant application of *Leon*, and so we concluded that overruling that holding was "a question that [would] have to await a case involving the reliance of an officer in good faith on the validity of a search warrant." Id. at 76 (4) (a) n.21.

Though much of *Mobley* on this point may have been dicta, we have since applied its rationale as a holding to admit evidence more times than we have ever applied *Gary* to suppress evidence. See *Outlaw v. State*, 311 Ga. 396, 400 (2) (b) n.4 (858 SE2d 63) (2021) (applying *Mobley* to hold that *Gary* did not foreclose the application of two other kinds of good faith exception when evidence was illegally seized without a warrant and to affirm the trial court's denial of a motion to suppress evidence); *Lofton v. State*, 310 Ga. 770, 782-784 (2) nn.17-18 (854 SE2d 690) (2021) (same), disapproved in part on other grounds by *Outlaw*, 311 Ga. at 401 (2) (b) n.5; *Swinson v. State*, 311 Ga. 48, 54-55 (2) (a) (855 SE2d 629) (2021)

(applying *Lofton* to affirm the trial court's denial of a motion to suppress evidence), disapproved in part on other grounds by *Outlaw*, 311 Ga. at 401 (2) (b) n.5; *Gialenios v. State*, 310 Ga. 869, 876-877 (2) (855 SE2d 559) (2021) (same), disapproved in part on other grounds by *Outlaw*, 311 Ga. at 401 (2) (b) n.5.

We also noted in *Mobley* that even before *Mobley*'s repudiation of *Gary*'s reasoning, both this Court and the Court of Appeals had regularly applied other exceptions to the exclusionary rule without any consideration of *Gary* or OCGA § 17-5-30. See *Mobley*, 307 Ga. at 74 (4) (a) (citing *Teal v. State*, 282 Ga. 319, 325 (2) (647 SE2d 15) (2007) (inevitable discovery exception); *Taylor v. State*, 274 Ga. 269, 274-275 (3) (553 SE2d 598) (2001) (inevitable discovery exception), disapproved in part on other grounds by *State v. Chulpayev*, 296 Ga. 764, 783 (3) (b) (770 SE2d 808) (2015); *Stephens v. State*, 346 Ga. App. 686, 691-693 (2) (816 SE2d 748) (2018) (independent source exception); *Pinkney v. State*, 332 Ga. App. 727, 731 (2) (774 SE2d 770) (2015) (independent source exception); *Ansley v. State*, 325 Ga. App. 226, 231 (1) (b) (750 SE2d 484) (2013) (independent source

exception); *Schweitzer v. State*, 319 Ga. App. 837, 840 (738 SE2d 669) (2013) (inevitable discovery exception); *Williams v. State*, 308 Ga. App. 464, 468 (2) (708 SE2d 32) (2011) (inevitable discovery exception); *Cunningham v. State*, 284 Ga. App. 739, 742 (644 SE2d 878) (2007) (inevitable discovery exception)).

In other words, the current state of Georgia law is that the statutory text "[a] defendant aggrieved by an unlawful search and seizure may move the court . . . to suppress as evidence anything so obtained" and "[i]f the motion is granted the . . . [evidence] shall not be admissible in evidence against the movant in any trial" somehow singles out the *Leon* good faith exception to the exclusionary rule — alone among all the other exceptions — as uniquely inapplicable in Georgia courts. There is no rational way to read those words to mean something so strange.

And unless we take the one final step that *Mobley* could not, that bizarre result will remain binding on all other Georgia courts. Whatever force stare decisis might have had before we started disassembling *Gary*, it has vanishingly little now. And while I have

62

often urged this Court to adhere to prior holdings as a matter of that doctrine, the time for that on this issue has come and gone.[29]

In short: (1) there is no support in the text of OCGA § 17-5-30 for the idea that the statute permits some exceptions to the exclusionary rule but excludes others; (2) the current state of the law is a mess of our own making, and we should clean it up; and (3) until we do, trial courts will be compelled to exclude evidence that federal law would admit, and the Court of Appeals will be compelled to affirm that exclusion. And in the face of all of this, the majority

---

[29] The fact that whether the trial court erred in denying the motion to suppress *can* be resolved without addressing the *Gary* issue does not hinder us from taking that final step here. Indeed, we did the same thing in *Woodard v. State*, 296 Ga. 803 (771 SE2d 362) (2015), where the case could "be resolved without reaching [the] issue" of whether *Heard v. State*, 261 Ga. 262 (402 SE2d 438) (1991) was "good law[.]" *Woodard*, 296 Ga. at 815 (1) (Benham, J., concurring specially). Today's majority overlooks the fact that the *Woodard* majority had options: (1) it could attempt to resolve the ineffective assistance of counsel claim on the "very close" question of whether the defendant was prejudiced by any deficient performance, id. at 810 (3) (b) & n.5; (2) it "could endeavor to distinguish [that] case from *Heard*[,]" id. at 814 (3) (b); or (3) it could "reconsider and overrule *Heard*[,]" id. at 811 (3) (b). And yet the *Woodard* majority held that "[t]he better course [was] simply to overrule *Heard* [then], before it [became] any more entrenched" and overruled *Heard*. Id. at 814 (3) (b). The use of "the better course" itself implies the existence of multiple courses the Court could have taken. Further, similar to the special concurrence in *Woodard*, the majority makes no attempt to justify keeping in place the mess that we created in *Gary*.

offers no explanation whatsoever for its decision to require all other Georgia courts to continue applying *Gary*. I would overrule whatever traces remain of *Gary* and affirm the trial court's denial of his motion to suppress under the *Leon* good faith exception to the exclusionary rule.

I am authorized to state that Chief Justice Boggs and Justice LaGrua join in this concurrence.